VIDEON CHEVROLET, INC., Plaintiff,

v.

GENERAL MOTORS CORPORATION,
Defendant.

Civ. A. No. 91–4202.

United States District Court,
E.D. Pennsylvania.

July 31, 1992.

Paul I. Guest, Jr., Paoli, Pa., for plaintiff.

Francis P. Burns, III, George J. Lavin, Jr. Associates, Philadelphia, Pa., Michael H. Carpenter, Jeffrey A. Lipps, Jones, Day, Reavis & Pogue, Columbus, Ohio, for defendant.

McGLYNN, District Judge.

## MEMORANDUM OF DECISION

In this diversity action, plaintiff Videon Chevrolet, Inc. alleges that defendant General Motors Corporation has violated section 9(a)(3) of the Pennsylvania Board of Vehicles Act, Pa.Stat.Ann. tit. 63, § 818.-9(a)(3) (Supp.1992). Plaintiff seeks damages and injunctive relief pursuant to section 818.20 of the same title. *Id.* § 818.20 (Supp.1992). Defendant now moves for summary judgment. For the reasons which follow, defendant's motion will be GRANTED.

## I. FACTUAL BACKGROUND

Plaintiff Videon Chevrolet, Inc., ("Videon") a Pennsylvania corporation, is a franchised automotive dealer of Chevrolet and GEO vehicles manufactured by defendant General Motors. ("GM"). In September 1988, defendant developed a nationwide program to increase its declining market share for Chevrolet. The program, called the Chevrolet Dealer Association Marketing Initiative ("Initiative"), implements what defendant contends is a one percent (1%) price increase on new motor vehicles sold to Chevrolet dealers like plaintiff, the revenues derived therefrom to be used by defendant to provide financial support for local Chevrolet advertising. By increasing its advertising dollars in a relevant geographic market, defendant hoped to increase its "share of voice" in the marketplace.[1] GM raised the revenue for the increased advertising by raising the dealer price of certain motor vehicles by 1% of the manufacturer's suggested retail price. Most of the additional revenues generated are allocated to organized dealer associations for their own advertising. Chevrolet purchases additional advertising in various locales to benefit dealers who are not members of an association. GM alleges that all dealers, whether members of an association or not, benefit from the Initiative and all are eligible to receive up to 25% of the 1% increase on vehicles sold to them for their own advertising efforts. (Def.'s Mot. for Summ. J. at 8).

The gravamen of plaintiff's complaint is that the Initiative violates section 9(a)(3) of the Pennsylvania Board of Vehicles Act, Pa.Stat.Ann. tit. 63, § 818.9(a)(3) (Supp. 1992).[2] It contends that the 1% increase is not a price increase but a masked attempt to force dealers to participate monetarily in an advertising campaign. Plaintiff asserts that the Initiative revenues generated by GM are not included in its "gross receipts or gross revenue tax returns filed anywhere throughout the United States" thereby refuting GM's argument that the increase is one of price. (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. at 4–5).

---

1. Defendant describes "share of voice" as "a marketer's percentage of all advertising dollars in a particular geographic market in the promotion of a product category.... In marketing, share of voice is a determinant of consumer demand and of a manufacturer's ability to increase sales." (Def.'s Mot. for Summ. J. at 5–6).

2. Section 9(a)(3) provides:
   (a) **Unlawful acts by manufacturers.**—It shall be a violation for any manufacturer, factory branch, distributor, field representative, officer, agent or any representative whatsoever of such manufacturer, factory branch or distributor licensed under this act to require, attempt to require, coerce or attempt to coerce any new vehicle dealer in this Commonwealth to:

   ·    ·    ·    ·    ·

   (3) Participate monetarily in an advertising campaign or contest or to purchase any promotional materials, training materials, showroom or other display decorations or materials at the expense of the new vehicle dealer. Pa.Stat.Ann. tit. 63, § 818.9(a)(3) (Supp.1992).

The GM Initiative first came to the attention of an attorney employed by the State Board of Vehicle Manufacturers, Dealers and Salespersons ("State Board") as the result of a letter from the Office of the Attorney General on September 16, 1988. (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J., Ex. E). The State Board then sent a letter dated December 7, 1988 to GM stating that its Initiative was a possible violation of section 9(a)(3). (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J., Ex. C). A complaint filed by Videon with the State Board in December 1989 and information from the State Board's prosecuting attorney culminated in the issuance of an order to show cause dated July 27, 1990. (Def.'s Mot. for Summ. J., Ex. B at 12).

It was the contention of the Commonwealth that GM's separate itemization of the 1% increase on the invoice was in violation of § 9(a)(3). Defendant therefore agreed as of March 1, 1992, to no longer itemize separately the 1% marketing adjustment on all Pennsylvania Chevrolet dealer invoices as it had since the inception of the Initiative. On August 8, 1991, the Commonwealth moved to withdraw the order to show cause. The motion was granted on October 25, 1991. (Def.'s Mot. for Summ. J., Ex. C & D). By including the 1% increase in the price to the dealer, GM asserts it is within the bounds of the Dealer Sales & Service Agreement 1.1.3. The Agreement states: "[p]rices, destination charges and other terms of sale applicable to any Motor Vehicle may be changed at any time." (Def.'s Mot. for Summ. J., Ex. 4).

The present action was filed in accordance with Pa.Stat.Ann. tit. 63, § 818.20 (Supp.1992).[3]

## II. LEGAL STANDARDS

### A. *Motion for Summary Judgment*

■ Under Federal Rule of Civil Procedure 56(c), the court must enter summary judgment where the record reveals no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *See San Filippo v. Bongiovanni,* 961 F.2d 1125, 1133 (3d Cir.1992). If not bearing the burden of proof at trial, the party moving for summary judgment need not negate the other party's case. The moving party may discharge its burden by demonstrating that an essential element of the opponent's case is absent. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

The issue *sub judice* is whether GM's implementation of the Marketing Initiative violates the Pennsylvania statute. The inferences drawn from the underlying facts are viewed in the light most favorable to the nonmovant. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *see Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Tigg Corp. v. Dow Corning Corp.,* 822 F.2d 358, 361 (3d Cir. 1987).

■ Plaintiff vigorously opposes defendant's Motion on the ground that there exists a factual issue to be resolved by a trier of fact: whether defendant's 1% marketing adjustment is a price increase or an illegal, coercive advertising assessment in violation of the statute. However, there is no dispute as to the historical facts. The focus is on the legal significance of those undisputed facts. Summary judgment, therefore, is a suitable vehicle for resolving the issues raised by the complaint and defendant's response.

---

**3. § 818.20 Civil actions for violations**

**(a) Action for damages.**—Notwithstanding the terms, provisions or conditions of any agreement or franchise or other terms or provision of any novation, waiver or other written instrument, any person who is or may be injured by a violation of a provision of this act or any party to a franchise who is so injured in his business or property by a viola-

tion of a provision of this act relating to that franchise, or any person so injured because he refuses to accede to a proposal for an arrangement which, if consummated, would be in violation of this act, may bring an action for damages and equitable relief, including injunctive relief, in any court of competent jurisdiction.

Pa.Stat.Ann. tit. 63, § 818.20 (Supp.1992).

B. *Interpretation of Pennsylvania Law*

▮ The jurisdiction of the court is founded upon diversity of citizenship. 28 U.S.C. § 1332. A federal court sitting in diversity must apply the substantive law of the state whose laws govern the action. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). The substantive law at issue is section 9(a)(3) of the Pennsylvania Board of Vehicles Act. Pa.Stat.Ann. tit. 63, § 818.-9(a)(3) (Supp.1992). The parties do not agree as to how this section of the Act should be interpreted. Plaintiff argues that GM's advertising initiative is proscribed by the plain language of the Act. GM, on the other hand, contends that the Act must be interpreted to prohibit only coerced participation in limited, special promotional campaigns. In an instance such as this, the "federal court must predict how the state's highest court would resolve the issue." *Lomax v. Nationwide Mutual Ins. Co.,* 964 F.2d 1343, 1345 (3d Cir.1992) (citing *Rabatin v. Columbus Lines, Inc.,* 790 F.2d 22, 24 (3d Cir.1986)); *see, Borse v. Piece Goods Shop, Inc.,* 963 F.2d 611, 614 (3d Cir.1992) (court must predict how Pennsylvania's highest court would resolve the issue); *Smith v. Calgon Carbon Corp.,* 917 F.2d 1338, 1341 (3d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1597, 113 L.Ed.2d 660 (1991) (same). Decisions of the lower state courts as well are not to be "disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide

otherwise." *West v. AT & T,* 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940).

## III. DISCUSSION

As noted above, the pertinent part of the statute speaks in terms of an advertising campaign or contest, promotion and training materials, display decorations or materials. The focus of our inquiry is on the phrase "advertising campaign." There is no relevant case law to guide or assist the court and the legislative history is nonexistent. Even the Agency charged with enforcing the law is unable to define "advertising campaign."[4]

It is plaintiff's position that the 1% increase is not a price increase but a mandatory fee dealers must pay to support GM's contractual obligation to advertise.[5] Plaintiff thus contends that instead of GM using its own funds to meet its contractual obligation to advertise, GM is raising the needed funds by forcing the dealers to pay a higher price for the automobiles. Plaintiff points out:

> The GM marketing adjustment is not included in the Chevrolet price schedules. The funds received by General Motors Corporation are not reported on any gross receipts or gross revenue tax returns. Finally, neither the revenue generated by the GM marketing adjustment nor the advertising expense disbursed are included in the General Motors Consolidated Annual Report as revenues or advertising expense.

(Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. at 20).

---

**4.** In deposition, the State Board's prosecuting attorney was unable to provide a definition:

> Q: What is an advertising campaign as a prosecutor? What is it?
> A: I don't have a concrete definition.
> Q: You don't have any definition that you could publicly announce so that manufacturers could determine or gauge their conduct?
> A: ... It would be what the board's interpretation of that language is.

(Def.'s Reply Mem. in Supp. of Mot. for Summ. J., Ex. G at 178, Dep. of David Callihan).

The State Board was also unable to define "advertising campaign":

> *INTERROGATORY NO. 2:* Describe with particularity the General Motors "advertising

campaign" which YOU contend is in violation of 63 P.S. § 818.9(a)(3)
> *RESPONSE TO INTERROGATORY NO. 2:* The Board cannot respond to this interrogatory as the term "advertising campaign" is not defined with sufficient particularity.

. . . .

(Def.'s Reply Mem. in Supp. of Mot. for Summ. J., Ex. B, *State Board of Manuf., Dealers and Salespersons v. General Motors,* 758 F.Supp. 1046 (M.D.Pa.1991) (Pl.'s Resps. to Def.'s Interrogs.)).

**5.** The agreement between GM and its dealers requires that both parties make efforts to market products. (Articles 2.3.1 and 2.5.4, Def.'s Mot. for Summ. J. at Ex. F4).

■ I am not persuaded that culpability under the Act ought to turn on how the revenue from a price increase is accounted for or not accounted for on the books of GM, or whether it is included on the invoice as a line item or allocated under some other heading. Such a resolution begs the question of whether a general price increase to defray advertising costs amounts to coercive participation in an advertising campaign. In effect, plaintiff is arguing that the Act prohibits automobile manufacturers from spending funds derived from the sale of vehicles to their franchised dealers to advertise their products.[6] It would prevent the manufacturers from charging off or passing through the cost of advertising. If manufacturers of automobiles were unable to recover the pro rata cost of advertising in the price of the automobiles sold to Pennsylvania dealers they would soon cease doing business in this Commonwealth to the great detriment of the citizens. Obviously the Legislature did not intend such a result.[7]

■ Reason and common sense dictate that the interpretation advocated by plaintiff must be rejected. Upon closer examination of the language it becomes apparent that the terms "advertising campaign or contest" encompass time-restricted, special advertising programs intended for a target audience. For example, an auto manufac-

turer elects to have a "4th of July" sales promotion replete with red, white and blue banners, streamers, posters and specific media buys. The manufacturer then charges its local new car dealer franchises for the special advertising and promotional materials, providing them no opportunity to "opt-out" of the special promotion. Dealers who refuse to accede, in retribution are denied the opportunity to purchase the more popular, fast-selling car models for their dealerships. Thus, when "advertising campaign" is defined within the context of the other terms incorporated in section 9(a)(3)—"promotional materials, training materials, showroom or other display decorations"—it is clear that the Legislature was targeting a particular form of economic strongarm other than a general price increase to be used to offset advertising costs.

Clearly section 9(a)(3) does not preclude auto manufacturers from making uniform price increases to its dealers, whether the amount is separately identified or included in the dealer base price.[8]

■ Plaintiff argues that GM's change in its billing procedure as of March 1, 1992 is an admission of liability for the period of time preceding that date. I disagree. The statute was not designed to regulate the billing practices or the manner in which the manufacturer allocates its costs, but to pre-

---

6. GM counters that such an interpretation amounts to an unconstitutional restriction on commercial speech. *See Board of Trustees v. Fox,* 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989); *Central Hudson Gas & Elec. Corp. v. Public Service Com'n of New York,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). In light of my decision of the issues presented, the constitutionality of the legislation need not be addressed.

7. A comparable North Carolina statute essentially tracks the language of the Pennsylvania statute but expressly adds what I believe is implicit in the Pennsylvania enactment:

nothing in this subsection shall preclude a manufacturer or distributor from including an unitemized uniform charge in the base price of the new motor vehicle charged to the dealer where such charge is attributable to advertising costs incurred or to be incurred by the manufacturer or distributor in the ordinary course of its business.

N.C.Gen.Stat. § 20–305(9) (1991). The tacit aims of the Pennsylvania statute may be read to include language such as above, otherwise the statute would fail as being overly broad and vague in the harm it seeks to prevent. Under Pennsylvania law, a court may consider interpretations of similar statutes in order to interpret a Pennsylvania statute. 1 Pa.Cons.Stat. Ann. § 1921(c)(5) (Supp.1992); *see General Elec. Environ. Services v. Envirotech Corp.,* 763 F.Supp. 113 (M.D.Pa.1991).

8. A deposition of plaintiff conducted pursuant to the proceedings in *State Board of Vehicle Manuf., Dealers and Salespersons v. General Motors.,* 758 F.Supp. 1046 (M.D.Pa.1991) produced the following exchange:

Q: If that one percent were built into the base price, would you have ever filed your complaint?
A: No.
Q: Would you have had any complaint?
A: No.
(Def.'s Mot. for Summ. J., Ex. E at 82).

vent the manufacturer from forcing the dealer to participate in a special promotional advertising campaign. Such is not the case here. A mere change in the billing practice transferring a 1% price increase from a line item to the base price is of no moment since the economic impact on the dealer is the same.

## IV. CONCLUSION

For the foregoing reasons, I predict that the Pennsylvania Supreme Court would conclude that section 9(a)(3) of the Pennsylvania Board of Vehicles Act, Pa.Stat.Ann. tit. 63, § 818.9(a)(3) (Supp.1992), does not prohibit a general price increase to dealers to defray advertising costs nor can a violation of the Act be predicated upon a billing practice that identifies the price increase as a separate item to be used for advertising. Defendant's motion for Summary Judgment will be GRANTED.