**VIDEON CHEVROLET, INC. (Formerly V–K Chevrolet, Inc.)**

v.

**GENERAL MOTORS CORPORATION,**

Videon Chevrolet, Inc., Appellant.

No. 92–1648.

United States Court of Appeals, Third Circuit.

Argued Feb. 23, 1993.

Decided May 3, 1993.

Paul I. Guest, Jr. (argued), Paoli, PA, for appellant.

George J. Lavin, Jr., Lavin, Coleman, Finarelli & Gray, Philadelphia, PA, Michael H. Carpenter (argued), Jones, Day, Reavis & Pogue, Columbus, OH, for appellee.

Before HUTCHINSON, NYGAARD and SEITZ, Circuit Judges.

## OPINION OF THE COURT

NYGAARD, Circuit Judge.

Plaintiff Videon Chevrolet, Inc. appeals from an order of the district court granting summary judgment in favor of defendant General Motors Corporation. We believe there is a genuine issue of material fact and will reverse and remand for trial.

### I.

Videon is a Chevrolet dealer under a franchise agreement with GM whereby both parties bear joint responsibility to promote Chevrolets. Videon is also a member of the Five–Star Dealers Association, an organization of regional dealers organized to collectively promote Chevrolets.

In 1988, GM became concerned about its dwindling "share of the voice" in local dealer advertising, particularly when compared to the marketing efforts of Ford dealers. To

**484**

correct this problem, which GM believed was partly responsible for Chevrolet's slightly declining market share, GM implemented a program known as the Chevrolet Dealer Association Marketing Initiative. Under this program, which began with the 1989 model year, GM added one percent to the dealer cost of each Chevrolet not intended for sale to an employee or fleet customer.[1] This mandatory surcharge appeared separately on dealers' invoices under the caption "GM Marketing Adjustment."

GM spent all funds raised by the Marketing Initiative on local advertising. If the dealer belonged to an association, GM rebated the monies to the dealer association. If it did not belong to an association, GM spent the funds directly on that dealer's behalf. Dealers were also eligible to receive twenty-five percent of the "adjustment" back if they spent it on approved advertising.

Videon was not satisfied with this arrangement, believing it could build market share more effectively on its own. The Videon Chevrolet dealership is located in Newtown Square, Pennsylvania, a small community in Delaware County bordering the Philadelphia metropolitan area. It typically advertises in local newspapers, such as the *News of Delaware County* and *The County Proceeds*. Videon felt that because the advertising planned by the association was targeted at the entire Philadelphia tri-state region, it would be of no help to Videon's strictly localized dealership.[2]

In December 1989, Videon filed an administrative complaint with the Pennsylvania Board of Vehicle Manufacturers, Dealers and Salespersons ("Board"), alleging that the Marketing Initiative constituted forced dealer participation in an advertising campaign and therefore violated the Pennsylvania Board of Vehicles Act ("the Act"), 63 Pa.Stat. Ann. § 818.1 *et seq.* (Purdon Supp.1992). In July 1990, the Board ordered GM to show cause why the Marketing Initiative did not violate the statute. In these proceedings, Frank Videon, Jr., the President of Videon

Chevrolet, Inc., gave deposition testimony about his views of the Marketing Initiative. GM and the Board settled this administrative case by an agreement under which GM would continue to collect the one percent surcharge, but would cease itemizing it separately on the dealer invoice.

During the administrative proceedings before the Board, Videon filed a diversity suit in the district court, asserting a private right of action under the Act. Videon's three-count complaint sought to enjoin GM from collecting the Marketing Adjustment and requested actual and punitive damages. GM answered the complaint, then moved for summary judgment. The district court granted GM's motion and dismissed the complaint with prejudice. *Videon Chevrolet, Inc. v. General Motors Corp.,* 798 F.Supp. 253 (E.D.Pa.1992). Videon timely appealed. We have jurisdiction under 28 U.S.C. § 1291 and exercise plenary review of the summary judgment. *E.g., Colburn v. Upper Darby Township,* 946 F.2d 1017, 1020 (3d Cir.1991). Affirmance is possible here only if we conclude that, after viewing the material evidence in the light most favorable to Videon, no jury could decide in its favor. *Tigg Corp. v. Dow Corning Corp.,* 822 F.2d 358, 361 (3d Cir.1987).

## II.

### A.

■ The district court's task was to predict whether the Supreme Court of Pennsylvania would hold that the Marketing Initiative could violate the Act. *See, e.g., Nationwide Insurance Co. v. Resseguie,* 980 F.2d 226, 229–30 (3d Cir.1992); *McMillan v. State Mutual Life Assurance Co.,* 922 F.2d 1073, 1077 (3d Cir.1990); *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.,* 652 F.2d 1165, 1167 (3d Cir.1981). Its prediction, like the summary judgment decision itself, is a question of law subject to plenary review. *Resseguie,* 980 F.2d at 229–30; *Ragen Corp.*

---

1. The surcharge was capped at $250 per vehicle. The marketing initiative did not affect the manufacturer's retail "sticker" price.

2. This complaint appears to be shared by many small automobile dealers located outside major metropolitan areas. *See* Arlena Sawyers, *Co-op Ads Inspire Anything but Dealer Cooperation, Automotive News,* Nov. 19, 1990, at 1.

*v. Kearney & Trecker Corp.*, 912 F.2d 619, 623 (3d Cir.1990).

Hence, the first issue to consider is whether the GM Marketing Adjustment, being in form a price increase to the dealer, could constitute forced participation in an advertising campaign within the meaning of the Act. The district court held as a matter of law that it did not. We disagree. Section 818.-9(a) provides, in pertinent part:

It shall be a violation for any manufacturer ... licensed under this act to require, attempt to require, coerce or attempt to coerce any new vehicle dealer in this Commonwealth to:

. . . . .

(3) Participate monetarily in an advertising campaign or contest or to purchase any promotional materials, training materials, showroom or other display decorations or materials at the expense of the new vehicle dealer.

Unfortunately, there have been no reported decisions from any court construing section 818.9(a)(3), nor is there any legislative history.[3] Faced with this dearth of assistance in the proper construction of the Act, the district court relied on "reason and common sense," stating

the terms "advertising campaign or contest" encompass time-restricted, special advertising programs intended for a target audience. For example, an auto manufacturer elects to have a "4th of July" sales promotion replete with red, white and blue banners, streamers, posters and specific media buys. The manufacturer then charges its local new car dealer franchises for the special advertising and promotional materials, providing them no opportunity to "opt-out" of the special promotion. Dealers who refuse to accede, in retribution are denied the opportunity to purchase the more popular, fast-selling car models for their dealerships. Thus, when "advertising campaign" is defined within the context of the other terms incorporat-

ed in section [818.]9(a)(3)—"promotional materials, training materials, showroom or other display decorations"—it is clear that the Legislature was targeting a particular form of economic strongarm other than a general price increase to be used to offset advertising costs.

798 F.Supp. at 257.

Although the district court's view of the Act might arguably constitute sound public policy were it sitting as a legislator, a court is not free in the absence of caselaw or legislative history to ignore the plain language of the statute. *See* 1 Pa.Cons.Stat.Ann.1921(b) (Purdon Supp.1992) ("when the words of a statute are clear and free from all ambiguity, the letter of [the statute] is not to be disregarded under the pretext of pursuing its spirit"); *Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1382–83 (3d Cir.1992) (applying section 1921 to construe Pennsylvania Board of Vehicles Act according to its plain language). Section 818.9(a)(3) prohibits forcing a dealer to participate "in an advertising campaign ... *or* to purchase any promotional materials, training materials, showroom or other display decorations. . . ." (Emphasis added.) The statute is phrased clearly in the disjunctive, indicating a legislative intent that forced participation in an advertising campaign may stand as an independent statutory violation, regardless of whether the dealer is also forced to purchase display decorations or other time-restricted material.

To buttress its construction of section 818.-9(a)(3), the district court referred to a similar North Carolina statute, N.C.Gen.Stat. § 20–305(9), which specifically exempts dealer charges targeted for advertising. 798 F.Supp. at 257 n. 7. This was incorrect. To begin with, the North Carolina statute specifically provides that only unitemized charges are exempt from the statute's coverage. Here, the charges were separately itemized on the dealer invoices until the settlement between GM and the Board. More fundamentally, the fact that the drafters of the

---

3. A number of other states have enacted similar statutes. *See* Ky.Rev.Stat.Ann. § 190.070(1)(d); La.Rev.Stat.Ann. § 32:1254(N)(6)(p); Me.Rev.Stat.Ann. tit. 10, § 1174(3)(D); Mont.Code Ann. 61–4–208(2); N.C.Gen.Stat. § 20–305(9); Ohio Rev.Code Ann. § 4517.59(F); Or.Rev.Stat. § 650.130(8). Unfortunately for our purposes, there is no relevant decisional law interpreting these statutes, either.

North Carolina statute felt compelled to exclude such charges from its coverage indicates, if anything, that charges like the GM Marketing Adjustment would violate a statute that did not have this exculpatory language.

■ We therefore hold that the district court erred when it held as a matter of statutory construction that the Marketing Initiative did not violate the Act because it was not an "advertising campaign or contest." Notwithstanding our view that the Act *can* apply to programs like the Marketing Initiative, we also hold that whether the program at issue in this case *actually* violated section 818.9(a)(3) is a question of fact. It may be argued that GM is free, under the Act, to announce a general, unitemized and untargeted price increase for *its* vehicles and spend the extra revenue on whatever it chooses, including advertising. On the other hand, it is not free to force dealers like Videon to participate in an advertising campaign. Whether the Marketing Initiative was, in intent as well as in operation, a price increase or an advertising campaign cannot be resolved as a matter of law. We therefore turn to the issue of whether Videon has produced sufficient evidence of disputed issues of material fact to avoid summary judgment.

### III.

GM argues, as a factual matter, that even if the Act could apply as a matter of law, the facts demonstrate that the Marketing Initiative was a lawful price increase, not a prohibited advertising campaign. It asserts that the testimony of Videon's expert accountant is irrelevant and, in any event, that Mr. Videon admitted the Marketing Initiative was a legitimate price increase. Finally, GM argues that Videon has not shown that it suffered any damages from the Initiative. We will address these contentions in turn.

### A.

■ After conducting discovery and in opposition to GM's motion for summary judgment, Videon prepared and submitted the affidavit of its expert, Ernest L. Ten Eyck, a Certified Public Accountant who formerly worked at the Securities and Exchange Commission. The purpose of this affidavit was to demonstrate that, contrary to GM's assertion that the GM Marketing Adjustment represented a mere price increase, GM's accounting treatment of the funds it received was inconsistent with the generally accepted accounting principles governing sales revenue. Mr. Ten Eyck examined GM's accounting records and found, *inter alia*, the following:

1.  The funds received from the GM Marketing Adjustment were not accounted for on its financial statements as sales but were held in a suspense account as a liability;

2.  The monies paid over to the dealer associations for advertising expenses were not recorded as advertising expenses, but as payments from the suspense account;

3.  GM did not include Marketing Adjustment funds as revenue on its tax returns.

From these observations, Mr. Ten Eyck concluded:

Were this marketing adjustment a simple "price increase" as GM asserts, the proper accounting for the transactions related thereto would be to include the amounts collected from the dealers as revenues (part of vehicle sales) and to record the amounts paid to the Dealer Marketing Associations ... as advertising expense.

⋅ ⋅ ⋅ ⋅ ⋅

In plain English, GM was accounting for the marketing adjustment *as if it were not GM's money.* It recorded neither revenues nor expenses.

(Emphasis in original.) The district court rejected this evidence as a matter of law, holding that it was immaterial:

I am not persuaded that culpability under the Act ought to turn on how the revenue from a price increase is accounted for or not accounted for on the books of GM, or whether it is included on the invoice as a line item or allocated under some other heading. Such a resolution begs the question of whether a general price increase to defray advertising costs amounts to coer-

cive participation in an advertising campaign.

798 F.Supp. at 257.

This was incorrect. We think that, far from begging the question, the method by which GM administered the Marketing Initiative and accounted for the funds it received is highly probative of whether the program was a price increase or a mandatory advertising campaign. Generally accepted accounting principles exist to protect stockholders and creditors from self-serving accounting devices. Violation of these standards can trigger a less than favorable audit report as well as difficulty with regulatory bodies such as the SEC. Likewise, failing to classify properly transactions for tax purposes can lead to civil and criminal liability. How a program such as the Marketing Initiative is accounted for is therefore a serious matter and is probative evidence of its true nature. We conclude the trier of fact should be permitted to weigh this evidence in determining whether the Initiative was a price increase or an advertising campaign.[4]

## B.

■ GM also argues that Mr. Videon, in his deposition in the Board proceeding, admitted that the Marketing Adjustment was a price increase. It asserts that Videon's expert testimony is merely an attempted self-impeachment of these statements and cannot properly be introduced to avoid summary judgment. We disagree. Although GM's selective quotations from the deposition tend to show that Mr. Videon believed the Marketing Adjustment was merely a price increase, the full record indicates otherwise. At Mr. Videon's deposition, the following exchange occurred:

> Q. It's not your contention in this case, is it, that General Motors cannot increase the price of its vehicles to pay for advertising; that's not your contention, is it?
>
> A. No.
>
> .    .    .    .    .

Q. And, again, I'm speaking only of concept. Do you have any objection to the concept of advertising being done for Chevrolet products at the local level?

A. As far as Chevrolet paying for the advertising?

Q. As far as advertising just in general, the concept of conducting and doing advertising at the local level.

A. I think what they do with their money is their business.

.    .    .    .    .

Q. So the problem is that the one percent charge is broken out rather than being included in the base price?

.    .    .    .    .

A. Yes.

.    .    .    .    .

Q. If that one percent were built into the base price, would you have ever filed your complaint?

A. No.

Q. Would you have had any complaint?

A. No.

Q. What is it about breaking it out separately on the invoice that causes you reason to be concerned and file your complaint?

A. Like I said, it is a charge which is mandatory. We don't have an option. And if they wanted to have it in the base price, why did they not put it there?

.    .    .    .    .

Q. There's no question in your mind that the one percent has increased the price of cars to you from Chevrolet; is that correct?

A. Yes.

.    .    .    .    .

Q. Is it the heart of this problem that you have with this marketing issue, Mr. Videon, the fact that you don't like people charging you an increased price for monies that will be spent on advertising?

A. I guess in a nutshell, I'd like to see Chevrolet do their own advertising and the dealers do their advertising.

---

**4.** Of course, at trial GM will have the opportunity to cross-examine Mr. Ten Eyck as well as put on its own expert testimony to prove that its ac- counting was consistent with a price increase rather than an advertising campaign.

It is obvious that the adjustment did result in a price increase to Videon. And although Videon did acknowledge in his testimony that the GM Marketing Adjustment was cast in the form of a price increase, we cannot say as a matter of law that he conceded one of the ultimate issues in the case. The thrust of this discussion between Mr. Videon and opposing counsel was Mr. Videon's objections to the Marketing Initiative, not whether the Initiative was a price increase. Mr. Videon's skillfully procured acquiescence in the use of the phrase "price increase," when there are only a limited number of words to describe the GM Marketing Adjustment, is simply not sufficient to constitute the concession GM seeks. To hold that such a semantic misstep from a witness untrained in the law effectively ends his case would only bring back the sporting theory of justice and open the door to sharp practices by counsel.[5]

■ Nor can we agree with GM as a matter of law that Mr. Ten Eyck's affidavit somehow constitutes prohibited self-impeachment of Mr. Videon's deposition testimony. Although GM cites *Martin v. Merrell Dow Pharmaceuticals, Inc.*, 851 F.2d 703 (3d Cir. 1988), that case is inapposite. In *Martin*, the mother of a child born with birth defects made eight sworn factual statements tending to negate liability on the part of the defendant drug manufacturer. Later, facing an almost certain loss on summary judgment, she submitted a flatly contradictory affidavit which contained no explanation for her change in position. We held that on those clear and extreme facts the district court could properly ignore the later affidavit. *See also Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir.1991). Here, Mr. Videon's deposition testimony was ambiguous and it does not appear that he intended it to go to the ultimate legal issue. It thus cannot fairly be said that Mr. Ten Eyck's affidavit improperly impeached Mr. Videon's earlier deposition testimony.

## C.

■ Section 818.20 of the Board of vehicles Act provides a private right of action to "any person who is or may be injured by a violation of a provision of this act." Based on the same deposition testimony quoted above, GM argues that, since Videon would have had no objection if GM had raised its prices without any itemization or mention of advertising, Videon was therefore not deprived of any additional money *as a result* of the Marketing Initiative. Because of this, GM asserts that the injury to Videon is merely cosmetic and therefore not cognizable. This argument proves too much. *Any* violation of the statute, even the Fourth of July sale discussed by the district court, could be absolved by the argument that no injury in fact occurred. Because such a rule would eviscerate the protection of the Act, we must reject GM's argument.[6]

## IV.

Because we hold that the district court erred in granting summary judgment in favor of GM, we will reverse and remand for trial.[7]

---

5. GM may, of course, introduce this evidence at trial, either as direct proof of the issue or for impeachment. The factfinder, however, will be the sole arbiter of how much weight to accord Mr. Videon's deposition testimony.

6. We also note that Mr. Videon's admission that he would have had no objection if GM had raised the price of Chevrolet vehicles without itemization or discussion of the reason for the increase proves nothing. This was probably not an acquiescence in the Marketing Initiative, but merely a recognition that, if such a price increase had occurred, he would have had no way of knowing what its purpose was.

7. GM also argued that if we hold the Act applies to the Marketing Initiative, its First Amendment commercial speech rights would be violated because it could not lawfully spend the money it collects on advertising. GM also asserted that section 818.9(a)(3) is unconstitutionally vague as applied to the Marketing Initiative. In view of our holding and disposition, we need not and do not reach these issues.