James BAILEY, Plaintiff,

v.

**UNITED AIRLINES, INCORPORATED, Defendant.**

**Civil Action No. 97–5223.**

United States District Court, E.D. Pennsylvania.

June 13, 2000.

Michael J. Torchia, Jenkintown, PA, for plaintiff.

Otto W. Immerl, Philadelphia, PA, for defendant.

### MEMORANDUM

LOWELL A. REED, Jr., Senior District Judge.

Plaintiff James Bailey ("Bailey") initiated this lawsuit, claiming he was terminated in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq. Presently before the Court is the motion of defendant United Airlines, Incorporated ("United") for summary judgment (Document No. 33), and the response and replies thereto. Because this suit is premised on a violation of the ADEA, this Court has original jurisdiction pursuant to 28 U.S.C. § 1331. For the reasons set forth below, the motion will be granted.

### I. Background [1]

For most of his career as a commercial airline pilot, Baily worked for Pan Ameri-

---

1. The following facts are based on the evidence of record viewed in the light most favorable to plaintiff James Bailey, the nonmoving party, as required when considering a motion for summary judgment. *See Carnegie Mellon Univ. v. Schwartz*, 105 F.3d 863, 865 (3d Cir.1997).

can World Airways ("Pan Am"). In 1991, after Pan Am declared bankruptcy, United purchased certain of Pan Am's South American routes. As part of that purchase, United agreed to hire a number of former Pan Am employees to operate those particular routes without requiring them to be subjected to a physical examination. As a result, Bailey was invited to seek employment with United. Bailey was 59 years old when United hired him in October of 1992.

Based upon his seniority, Bailey was able to bid for a first officer (co-pilot) position. To fly as a first officer for United, Bailey was required to pass United's first officer training. He passed the training in November of 1992.

Bailey turned sixty years old on March 5, 1993, approximately four months after completing his first officer training at United. Federal Aviation Regulations provide that "[n]o person may serve as a pilot on an airplane . . . if that person has reached his 60th birthday." 14 C.F.R. § 121.383(c). Accordingly, United notified Bailey that he was no longer qualified to work as a first officer. Bailey was, however, given the opportunity to bid for a position as a second officer or flight engineer, a non-flying position, upon the successful completion of the transition training required by United. Bailey had good reason to believe that he could continue his career as a second officer. During the years 1992–1997, 577 out of 584, approximately ninety-nine percent (99%), of United pilots who turned sixty and sought to continue with United as second officers satisfactorily completed second officer training.

The second officer training is a multi-week training consisting of a combination of ground school classroom work and participation in aircraft simulator periods. After a probationary second officer candidate completes this preliminary training, he or she takes an both an oral and written exam as well as a simulator "check ride" which is the final test designed to present the candidate with various real-life flying conditions. When a candidate fails a certification check, requires excessive additional training, or appears unsuitable for employment, a Board of Review ("Board") is convened to consider what remedial action, up to and including discharge of the candidate, should be taken.

Bailey began the DC–10 probationary second officer training in April of 1993. An April 16th evaluation rates Bailey's technical ability as 2—"needs improvement." (Plaintiff's Memorandum of Law in Opposition to Motion for Summary Judgment of Defendant United Airlines, Inc. ("Plt Mem."), Exh. 18). The evaluator, James Grimm, also commented that Bailey was "not able to perform cockpit setup or SOPs." (Id.). The authenticity of this evaluation has been challenged by Bailey.[2] Bailey has submitted a different evaluation form dated April 16, 1993, and signed by Grimm. (Id. at Exh. 19). At his deposition, Grimm first denied that he completed any evaluation other than the one in Bailey's personnel file. However, he conceded that another evaluation form existed when confronted with a copy of a "secreted" evaluation. Nevertheless, United points out that both evaluations rated Bailey's technical ability as "needs improvement." The only apparent discrepancy between the two evaluations is the comment: the "secreted" evaluation states "performance of normal SOP is done with uncertainty and slowness which led to items not be [sic] completed." (Id.).

An April 27th evaluation rates Bailey's technical ability as 2.5, somewhere between "needs improvement" and "standard." In most of the behavioral categories, Bailey received a rating of 3 ("standard"). Bailey did receive a 2 ("needs improvement") in the area of planning/organization and a rating of a 4 ("above standard") in "objectivity/motiva-

---

**2.** In an Order dated October 25, 1999, Magistrate Judge Angell, having held a hearing, ruled that Bailey failed to make out a *prima facie* case of evidence tampering by United.

tion/industry." The evaluator, W.J. Pierson, also commented that Bailey "has worked incredibly hard to master the DC–10, and he'll be a fine second officer for [United]." (Plt Mem., Exh. 14).

The simulator training records for Bailey from April 20 through April 29 reflect that in on most days and in most of the executing standard operating procedures ("SOP") categories, Bailey received a rating of 3 ("Average") on a scale of 1 ("Unsatisfactory") to 5 ("Excellent"). Bailey did, however, receive a number of 1's and a few 2's. Comments were made on those areas where Bailey received less than a rating of 3. Most of Bailey's difficulties had to do with ground operations. The April 23rd entry reads "[e]xtremely slow and unsure of proper techniques during non-standard and unusual operations." Similarly, the April 27 entry reads "Jim is still slow and appears unsure of how to deal with unusual or irregular problems during all phases of ground operations" and "with respect to ground systems and set-up, Jim was not up to speed on systems." The last entry on April 28th reads "[a]gain, not quite up to speed on system." (Defendant United Air Lines [sic], Inc.'s Memorandum of Law in Support of Its Renewed Motion for Summary Judgment ("Def.Mem."), Exh. 8).

On April 30, 1993, Bailey failed his simulator check ride. Bailey's instructor, Joe Onodera, noted that Bailey failed to perform SOPs and to handle emergencies or critical irregularities, needed additional training in "engine start problems" and "pneumatic system" and recommended at least two additional periods in the simulator. (Def.Mem., Exh. 10). Onodera informed Bailey immediately after the check ride that Bailey did not pass. (Def. Mem, Exh. 1, Deposition Testimony of James Bailey, at 113). According to Bailey, he was quite upset at having failed the test because he was on probation. (*Id.*). Bailey also called Joe Pierson, another instructor, and told Pierson that he did not pass the check ride. (*Id.* at 114). Bailey

was told after failing the test that United "would probably hold a Board of Review," although Bailey maintains that he was initially given assurances that he would be provided additional simulator training and another check ride. (*Id.* at 113–14 and 120). Knowing that some action would be taken but confident that he would be given another chance, Bailey returned home to Pennsylvania for the weekend.

According to Bailey, upon his return from the weekend, however, he was informed things "[didn't] look good" and that he was to report to the chief pilot's office in San Francisco. (Bailey Dep. at 114 and 123). At his deposition, Bailey testified that he was called "a day later" and told to report to San Francisco "to be terminated." (*Id.* at 114). Bailey also testified that he was "told that the board was not going to recommend me for further training." (*Id.*).

Bailey further testified that in the interim between being told to report to the chief pilot's office in San Francisco and the time he actually went to San Francisco, he called a number of people in an effort to reverse the decision of the Board, including former Pan Am pilots and instructors, asking them to contact Captain Daly, the chief pilot, on his behalf. (Bailey Dep. at 124–127). For example, Bailey testified that as part of his effort to change the Board's decision, he called Joe Pierson, one of his instructors, "the night before I left Denver to go to San Francisco." (*Id.* at 126). Bailey also asked a former chief pilot at Pan Am who was now working for United to call Captain Daly and to give him an evaluation of Bailey's "26 year as a professional captain and flight engineer." (*Id.* at 124–25). Bailey also contacted Tom Krueger, an instructor who gave him a simulator check during his first officer training. Bailey testified that Krueger thought Bailey was "basically a good pilot" but that Bailey was "slow" on United's SOPs. (*Id.* at 127).

During this time, Bailey also tried to contact United's senior vice president of

flight operations to tell him that the training, the SOPs and checklists were "archaic," and that the training was tainted by agism. (*Id.* at 128). For this later assertion, Bailey relies upon the fact that younger United employees apparently refer to older pilots who have since become second officers as "herpes," intimating that "they never go away."[3] (*Id.* at 128; Plt. Mem., Exh. 3 at 37; Exh. 4 at 63–65). Bailey also relies on the fact that his instructor Joe Pierson, was "not professional and somewhat disrespectful" in his approach to Bailey's training.[4] (Bailey Dep. at 105–06). This apparently was exhibited through Pierson's mannerisms and his comments, although Bailey could not recall a specific incident. (*Id.* at 96, 105). Bailey also asserts that according to United's records, at least six younger candidates were given more simulator training than was provided to him. (Plt Mem. at 33 (citing Def. Mem., Exh. 21)).

Bailey was accompanied to San Francisco by his union representative and a former Pan Am pilot as a witness. In San Francisco, Bailey testified that he met with Captain Eric Clethen, the new hire coordinator, who gave Bailey the option of resigning upon the condition that he sign a release. Bailey refused to sign the release. The meeting, according to Bailey was *pro forma.* Bailey also met separately with Captain Daly, the chief pilot, who discussed in detail Bailey's training performance. (*Id.* at 115–16).

This account of the events up to May 6, 1993, is consistent with an affidavit submitted by Clethen. Clethen attests that he was a member of the Board of Review, held on May 4, 1993, which, after considering Bailey's employment and training, decided to terminate Bailey. Clethen further attests that subsequent to the Board of Review's meeting, he "called Mr. Bailey, informed him of the Board's decision and asked him to travel to San Francisco on May 5, 1993 where he would be removed from United's payroll and offered the opportunity to resign in lieu of termination. Mr. Bailey was required to travel to San Francisco because that was his assigned domicile. Mr. Bailey informed me that he could not make a meeting on May 5th but would be available on May 6, 1993." (Exh. 3 at ¶ 20).

In a subsequent "counter-affidavit," however, Bailey asserts that he learned that a Board of Review had been held "no sooner" than he was asked to meet with the chief pilot in San Francisco and that he did not know what the Board of Review had recommended. In his affidavit, Bailey further asserts that he was in fact optimistic that he would be allowed to complete additional training. (Plt.Mem., Exh.1). Bailey further asserts in his affidavit that he "promptly" traveled to San Francisco.[5]

In any event, it was not until May 6th that Bailey met with United officials and was officially terminated. On March 2,

---

**3.** Although Bailey asserts that he had "absolutely" heard the term "herpes" directed towards him, he could not identify the who did so and stated that it was directed at him only one or two times in a crew room by his co-workers. (Bailey Dep. at 62–63). There is no evidence that anyone other than co-employees, i.e., no decision-maker, ever used the term.

**4.** This is the same Joe Pierson who Bailey called after he failed the check ride (and who, according to Bailey, was disappointed to hear he had failed). Bailey also contacted Pierson prior to his May 6th meeting in San Francisco and asked him to put a good word in for him with Captain Daly.

**5.** Although United maintains that a Board of Review was held on May 4th and that it informed Bailey that, as a result, he would be terminated, Bailey questions whether a Board of Review was ever held, arguing that the decision to fire him was made without a Board of Review and alleging that a false record of the meeting was created after the fact. Although Bailey's argument may be relevant to an analysis of his ADEA claim, the operative fact for purposes of analyzing whether the limitations period has run is when he was provided notice that he was going to be terminated.

1994, the three hundredth day after May 6, 1993, Bailey signed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). Subsequently, on August 8, 1997, Bailey filed this lawsuit.

## II. Legal Standard

Defendant has moved pursuant to Federal Rule of Civil Procedure 56 for summary judgment. Under Federal Rule of Civil Procedure 56(c), summary judgment may be granted when, "after considering the record evidence in the light most favorable to the nonmoving party, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Turner v. Schering–Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). For a dispute to be "genuine," the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the non-moving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-moving party may not rely merely upon bare assertions, conclusory allegations, or suspicions. *Fireman's Ins. Co. v. Du Fresne*, 676 F.2d 965, 969 (3d Cir.1982).

## III. Discussion [6]

The ADEA requires that a discrimination charge be timely filed with the EEOC prior to the initiation of an action in federal court. 29 U.S.C. § 626(d); *Courtney v. La Salle Univ.*, 124 F.3d 499, 502, 504 (3d Cir.1997); *Bullock v. Balis & Co., Inc.*, 1999 WL 527792, at *3 (E.D.Pa. Jul.22, 1999). In a "deferral state" such as Pennsylvania—one which has an agency which performs functions similar to those which the EEOC performs—the EEOC charge must be filed within 300 days of the occurrence of the alleged unlawful practice. 29 U.S.C. § 262(d)(2); *Colgan v. Fisher Scientific Co.*, 935 F.2d 1407, 1414–15 (3d Cir.) (en banc) (EEOC charge is regarded as Pennsylvania filing and plaintiff is entitled to the extended period of 300 days provided by § 626(d)(2) regardless of whether he filed a state administrative complaint within 180 days after the alleged discrimination occurred), *cert. denied*, 502 U.S. 941, 112 S.Ct. 379, 116 L.Ed.2d 330 (1991); *Davis v. Calgon Corp.*, 627 F.2d 674, 677 (3d Cir.1980) (per curiam), *cert. denied*, 449 U.S. 1101, 101 S.Ct. 897, 66 L.Ed.2d 827 (1981); *Cardoza v. Merion Cricket Club*, 1996 WL 653397, at *6 (E.D.Pa. May 2, 1996); *Guarnaccia v. John Wanamaker, Inc.*, 1990 WL 90490, at *3 (E.D.Pa.1990) (because Pennsylvania is a deferral state where the state agency performs functions similar to the EEOC, the 300–day filing period applies). Here, it is undisputed that Bailey filed his administrative charge with the EEOC on March 2, 1994. To be timely, Bailey must have suffered the unlawful employment practice on or after May 6, 1993. Accordingly, to decide whether the action is time barred, the Court must determine the date on which the limitation period began to run.

Bailey argues that the limitations period began to run on May 6, 1993, when he was actually separated from United.[7] His fil-

---

**6.** The plaintiff's argument that United's motion for summary judgment should be dismissed as untimely is without merit. Although the motion was filed one day after the deadline specified in the magistrate judge's scheduling Order dated July 1, 1999, the date specified in that Order, October 11, 1999, was Columbus Day, a federal holiday. Accordingly, United's motion is timely under Federal Rule of Civil Procedure 6. *Greenberg v. United States*, 873 F.Supp. 912, 913 n. 1 (M.D.Pa. 1993), *aff'd*, 46 F.3d 239 (3d Cir.1994).

**7.** Bailey also asserts that he visited to the EEOC prior to March 2, 1994, and filled out an intake questionnaire. This assertion, without more, is insufficient to toll the 300–day filing period. *Gulezian v. Drexel Univ.*, 1999

ing on March 2, 1994, the three hundredth day after his being separated from United, would therefore be timely. United argues that the limitations period began when Bailey was informed by Clethen that a Board of Review had been held and that Bailey would be terminated. According to Clethen, Bailey could not return to San Francisco, his assigned domicile, on May 5th as requested, but would be there on May 6th instead.

" 'There threshold inquiry in evaluating the timeliness of plaintiff's ADEA claim is to identify precisely the unlawful employment practice of which he complains.' " *Guarnaccia*, 1990 WL 90490, at *3 (quoting *Delaware State College v. Ricks*, 449 U.S. 250, 257, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980)). Here, Bailey claims that he was unlawfully discharged because of this age.

■ It is well established that for purposes of filing a charge claiming unlawful discharge, the limitations period "must be measured from the date the plaintiff was advised he was to be discharged" as opposed to the date of separation. *Guarnaccia*, 1990 WL 90490, at *3; *see also Bouker v. CIGNA Corp.*, 1994 WL 594273, at *2 (E.D.Pa. Oct.24, 1994), *aff'd*, 70 F.3d 1254 (3d Cir.1995). In *Guarnaccia*, the plaintiff was advised at a meeting on March 30, 1987, by the President of Marketing that, due to a reduction in force, the plaintiff would be terminated on September 15, 1987. The plaintiff also testified that as early as February of 1987, the President of Marketing told him, "I'd go out and find a job if I were you, right away." *Id.* at *5. The plaintiff filed his EEOC charge on February 8, 1988. *Id.* at *2. The court determined that the plaintiff's ADEA claim was time barred because the plaintiff learned, on or before March 30, 1987, that his employer intended to terminate his employment effective September 15, 1987. *Id.* at *6. The fact that the plaintiff held

out the hope that his employer would reconsider its decision, did not toll the limitations period.

Similarly, in *Bouker*, the defendant informed the plaintiff on January 29, 1992, that he would have continued employment with CIGNA only if he agreed to assume additional responsibility in connection with his position. 1994 WL 594273, at *1. Two days later, hoping that CIGNA might later modify its stance, the plaintiff declined the offer, believing the job to be more than one person could effectively handle. *Id.* at *2, *3 & n. 6. On April 20, 1992, CIGNA formally informed the plaintiff that his position was to be eliminated effective June 15, 1992. *Id.* at *1. The plaintiff filed a charge of discrimination with the EEOC on January 20, 1993, over 350 days after the defendant's offer of continued employment but only 270 days after the formal notice of termination on April 20, 1992. *Id.*

The defendant moved for summary judgment on the grounds that the plaintiff's charge was untimely filed. The *Bouker* Court determined that the filing period began to run on January 29, 1992. In so doing, the court reasoned that although the plaintiff "did not feel the painful consequences of the alleged pretextual job offer until the day he was formally notified of his termination, ... this did not delay the commencement of the filing period." *Id.* at *3. Thus, the court concluded that the action was time-barred. *Id.*

Here, the undisputed evidence shows that Clethen called Bailey prior to the May 6th meeting to ask that Bailey report to San Francisco. Clethen further attests that in the course of his conversation with Bailey, he told Bailey that a Board of Review had been held and that Bailey would be terminated. This is consistent with Bailey's deposition testimony where he explained that he was "told that the

WL 153720, at *2–*3 (E.D.Pa. Mar.19, 1999) (discussing when communication with EEOC

may constitute a charge).

board was not going to recommend me for further training" and "told to report to San Francisco to be terminated." (Bailey Dep. at 114). As in *Bouker* and *Guarnaccia*, the fact that Bailey tried to garner advocates to convince the Board to change its decision does not toll the limitations period. *See Ricks*, 449 U.S. at 261 n. 15, 101 S.Ct. 498 ("Mere requests to reconsider, however, cannot extent the limitations period . . . .").

In his response to United's motion for summary judgment, Bailey submitted an affidavit in which he attested that "no sooner had I learned that the board of review had met than I was asked to travel to San Francisco to meet with the chief pilot. I promptly traveled from Denver to San Francisco to meet with the chief pilot. At the time I did not know what the chief pilot's decision was; nor did I know what the board of review's recommendation had been." (Plt. Mem., Exh. 1 at ¶ 22). The affidavit does not, however, establish a genuine issue of material fact as to whether Bailey had notice prior to May 6th that he would be terminated.

It is well established that a party cannot avoid summary judgment by submitting an affidavit, without a satisfactory explanation, that contradicts earlier deposition testimony. *See, e.g., Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir. 1991); *Martin v. Merrell Dow Pharmaceuticals, Inc.*, 851 F.2d 703, 705 (3d Cir. 1988); *Blackburn v. United Parcel Serv., Inc.*, 3 F.Supp.2d 504, 516 n. 10 (D.N.J. 1998), *aff'd*, 179 F.3d 81 (1999); *Werner v. Philadelphia Gas Works*, 1997 WL 610498, at *3–*4 (E.D.Pa. Sept.30, 1997); *Phillips v. Lehigh Valley Ass'n of Rehabilitation Centers, Inc.*, 1995 WL 27152, at *5 n. 10 (E.D.Pa. Jan.18, 1995); *Federal Ins. Co. v. Ayers*, 1992 WL 95912, at *2 (E.D.Pa. Apr.21, 1992). The affidavit offered by Bailey does not offer any explanation for the apparent inconsistency with his sworn deposition testimony.[8] *See Hackman*, 932

---

8. In the wake of his failure to explain the discrepancy between his affidavit and his deposition testimony, Bailey is left with his attorney's attempt to try and explain away his deposition testimony. The arguments of an attorney, however, are not evidence and absent supporting evidence cannot create an issue of fact. Even if an unsworn argument made by an attorney could sufficiently explain the inconsistencies between a post-deposition affidavit and sworn deposition testimony, the explanations offered by counsel here are insufficient.

The argument that the "Bailey's testimony suggests that the telephone call to come to San Francisco was the same day as the actual meeting in San Francisco" falls far short of offering a plausible explanation. (Plt.'s Mem. at 13). During his deposition testimony, Bailey clearly stated that in an attempt to garner advocates to support his effort to have the Board change its decision, he called one of his instructors *the night before* he left for San Francisco. (Bailey Dep. at 126). There is no reason to question this sequence of events and Bailey's affidavit supports his deposition testimony in this respect. Moreover, Bailey could presumably provide a definitive answer to the question of when he received the call from the Chief Pilot's office. He has chosen instead to let his attorney argue inference and supposition to explain his sworn deposition testimony.

Counsel's argument that Bailey's deposition statement was obviously ironic and made with hindsight is also insufficient. The context of the testimony does not reveal any sense of irony. Moreover, all deposition testimony is given with hindsight. To permit a deponent to dismiss his deposition testimony as having conflated what he knew at the time of the events with what he learned subsequently, *without more*, would therefore undermine, if not seriously impair, the judicial process and the objectives of summary judgment themselves.

Lastly, the argument that Bailey's deposition statement should be disregarded because defense counsel did not ask any follow-up questions to clarify the statement is ill-conceived. (Plt. Mem. at 12–13). First, the statement is clear on its face and there would appear to be no reason for an explanation. Second, there is no reason to assume that defense counsel knew (any more than plaintiff's counsel) the significance of the statement at the time it was made. Indeed, *plaintiff's* counsel could just as easily be faulted for not trying to clarify the point, especially because it may be assumed that he was familiar with his client's case and the sequence of events, as it is a dispositive issue for his client's case. Regardless, the fact that neither side sought to clarify Bailey's narration of events at his

F.2d at 241 (post-deposition affidavit alleging that plaintiff had been confused about dates insufficient to create genuine issue of material fact with respect to when limitations period began to run); *Martin,* 851 F.2d at 706 ("Moreover, no explanation was offered in the affidavit for the contradictions."); *see also Holland v. Jefferson Nat'l Life Ins. Co.,* 883 F.2d 1307, 1315 (7th Cir.1989) (affidavit in civil case must explain apparent inconsistency with deposition testimony in order to create an issue of fact on summary judgment); *Kriskovic v. Wal–Mart Stores, Inc.,* 948 F.Supp. 1355, 1358 n. 3 (E.D.Wis.1996) (plaintiff did not attempt to explain inconsistency in sworn statement to court); *Waitek v. Dalkon Shield Claimants Trust,* 908 F.Supp. 672, 685–86 (N.D.Iowa 1995) (collecting cases). Nor does the affidavit serve to further explain or clarify Bailey's deposition testimony.[9] *See Pellegrino v. McMillen Lumber Prods., Corp.,* 16 F.Supp.2d 574, 583–84 (W.D.Pa.1996); *see also Samuels v. Albert Einstein Med. Ctr.,* 1998 WL 690107, 1998 U.S. Dist. LEXIS 14486, at \*14–16 (E.D.Pa. Sept. 14, 1998) (affidavit explained deposition testimony); *Giancristoforo v. Mission Gas & Oil Prods., Inc.,* 776 F.Supp. 1037, 1043 (E.D.Pa.1991) (affidavit did not contradict but clarified deposition testimony).

Having carefully reviewed the deposition testimony, it is clear that Bailey's testimony rendition of events was not "skillfully procured" under clever questioning or a "semantic misstep" on the part of Bailey. *See Videon Chevrolet, Inc. v. General Motors Corp.,* 992 F.2d 482, 488 (3d Cir.1993). Moreover, his statement that he was told he would be terminated in San Francisco is consistent with his other deposition testimony. (Def. Mem., Exh. 1 at 111–129). The Court will therefore disregard Bailey's affidavit to the extent that it contradicts his deposition testimony. Because the evidence that Bailey received notice that he was going to be terminated prior to May 6, 1993, is unrebutted (and in fact is corroborated by Bailey's deposition testimony), I hold that Bailey's claim is time barred. Summary judgment is therefore appropriate.

## IV. Conclusion

I conclude that Bailey has presented no admissible evidence from which a reasonable jury could conclude that Bailey was first notified that he would be terminated from his employment with United on or after May 6, 1993. Indeed, Bailey's own sworn testimony precludes any conclusion to the contrary.

"While statutes of limitations, along with many other procedural protections afforded litigants ..., might appear arbitrary to some litigants, the purpose of any statute of limitations is to expedite litigation and thus discourage delay and the presentation of stale claims." *Barkley v. FMP/Lakeside Assocs.,* 1999 WL 345567, at \*5

---

deposition does not create an ambiguity where none exists.

9. Indeed, Bailey's affidavit is remarkable more for what it does not contain than for what it does contain. In the face of Clethen's affidavit and his own testimony, Bailey does not squarely address the phone call or if he was told that he would be terminated. He also does not explain his prior testimony that he had been told that the Board was not going to recommend him for further training. Thus, not only does Bailey fail to explain the contradiction with his deposition testimony, his affidavit is evasive with respect to the most crucial facts. Instead of refuting Clethen's sworn statement, Bailey chooses only to state that "at the time" he did not know "what the chief pilot's decision was" or "what the board of review's recommendation had been." (Plt. Mem. Exh. 1 at ¶ 22). Significantly, Bailey avoids stating that he was told by Clethen that he would be terminated at the May 6th meeting.

Regardless, Bailey's evasiveness does not aid him because, to the extent that it can be argued that Bailey's affidavit does not actually contradict his earlier testimony, the affidavit of Clethen and Bailey's earlier testimony stand unrebutted. Thus, Bailey's affidavit does not establish a genuine issue of material fact with respect to his having received notice of his imminent termination, such that the limitations period began to run, prior to May 6, 1993.

(E.D.Pa. May 14, 1999). Any statute of limitations is necessarily arbitrary, however, the length or period allowed for instituting suit inevitably reflects a "value judgment concerning the point at which the interests in favor of protecting valid claims are outweighed by the interests in prohibiting prosecution of stale ones . . . ." *Ricks,* 449 U.S. at 260, 101 S.Ct. 498 (quoting *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 463, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975)). The defense of the statute of limitations is therefore not a technical one, but a substantial and meritorious defense. *American Pipe & Construction Co. v. Utah,* 414 U.S. 538, 554, 555, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974) ("The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of the limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them"). Here, Congress legislated the 300–day statute of limitations for the valid purpose of preventing stale claims. Granting summary judgment is consistent with this purpose. *Hicks v. Big Brothers/Big Sisters of America,* 944 F.Supp. 405, 408 (E.D.Pa.1996). Accordingly, based upon the foregoing analysis, the motion will be granted.