Angeline M. PELLEGRINO, Plaintiff,

v.

McMILLEN LUMBER PRODUCTS COR-
PORATION, Irwin Wood Products, Inc.
and McMillen Lumber Company of
Sheffield, Inc., Defendants.

No. CIV. A. 95–9.

United States District Court,
W.D. Pennsylvania.

Sept. 13, 1996.

James B. Lieber, Lucinda A. Bush, Lieber & Hammer, Pittsburgh, PA, for Plaintiff.

Ralph A. Finizio, Michael C. Turzai, Houston Harbaugh, Pittsburgh, PA, for Defendants.

### *MEMORANDUM OPINION*

McLAUGHLIN, District Judge.

Plaintiff, Angeline M. Pellegrino, brings the instant action alleging various infringements of her civil rights and interference with her employee benefit rights in violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. §§ 2000e *et seq.*, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, the Pennsylvania Human Relations Act ("PHRA"), Pa. Stat. Ann. tit. 43, §§ 951 *et seq.* (1991 & 1996 Supp.), and the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*

Presently pending before this Court are Defendants' motion for summary judgment, motions to strike certain portions of two affidavits submitted by Plaintiff in opposition to the motion for summary judgment, and a motion to strike Plaintiff's request for a jury trial. This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331. We have jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

### I. *BACKGROUND* [1]

Defendants McMillen Lumber Products Corporation and Irwin Wood Products, Inc. are Pennsylvania corporations with their principle places of business in Sheffield, Pennsylvania. They are engaged in the business of manufacturing furniture dimension stock. Defendant McMillen Lumber Company of Sheffield, Inc. is a Pennsylvania corporation, also with its principal place of business in Sheffield, Pennsylvania. It is engaged in logging and sawmill operations, including manufacturing lumber and selling lumber products to the other two Defendants. (These entities will be collectively referred to hereafter as the "McMillen Companies" or the "Companies" or "Defendants.")

During the 1940s Wendell W. McMillen founded a family lumber business which subsequently evolved into the present day McMillen Companies. Wendell was the father of James McMillen, Joyce Olson, and Robert McMillen, all current majority shareholders and officers of the McMillen Companies. In 1945, Pellegrino became employed by Wendell McMillen. At the time, Wendell was thirty-one years old and Pellegrino was seventeen. Up until 1992, when Wendell retired from the business, Pellegrino's responsibilities encompassed a variety of duties including receipt and distribution of the mail, bookkeeping, typing correspondence, answering the telephone, preparing salary payroll and tax statements, and serving as Wendell McMillen's personal secretary.

During the course of Pellegrino's employment, she and Wendell McMillen became involved in a romantic affair which lasted many years. Defendants contend that Wendell became romantically involved with Pellegrino relatively early on in her tenure. Plaintiff maintains that her relationship with Wendell was sexually coercive before it became ro-

---

1. Except as otherwise indicated, the following facts are not disputed by the parties. Where disputed, the facts are construed in the light most favorable to Plaintiff.

mantic. Throughout most of his romantic involvement with Pellegrino, Wendell McMillen remained married to the mother of the McMillen children. Pellegrino and Wendell eventually became engaged to be married after Mrs. McMillen died in 1988.

Not surprisingly, the relationship between Wendell and Pellegrino resulted in great strain and tension in the McMillen family over many years and became the source of considerable resentment by the McMillen children, all of whom had been involved with the business and had known of their father's affair since their high school years. Pellegrino contends, however, that she herself never harbored or acted on any animosity toward the McMillen children and that their animosity was one-sided.

In or around January of 1990, Wendell McMillen began to exhibit symptoms of Alzheimers Disease and his condition deteriorated rapidly thereafter. In March 1992 he ceased regular employment with the Companies and, in December 1992, he was adjudicated an incapacitated person. Wendell's sons James and Robert were appointed plenary guardians of his estate. With the onset of Wendell McMillen's illness, James McMillen took over his father's principal management role in the Companies. James is President of McMillen Lumber Products Corporation and McMillen Lumber Company of Sheffield, Inc. and Vice President of Irwin Wood Products, Inc. Robert McMillen is the President of Irwin Wood Products, Inc. and Vice President of McMillen Lumber Products Corporation and McMillen Lumber Company of Sheffield, Inc. Joyce Olson is the Secretary of all three Companies.

Following Wendell McMillen's retirement, the personal animosity stemming from Pellegrino's affair with him came to a head. Defendants claim that numerous manifestations of tension, animosity, and power struggles occurred at the Companies. Pellegrino maintains that the animosity was one-sided, emanating only from the McMillen children and not from her. She denies that there was any legitimate perception of a power struggle inasmuch as she was a minority shareholder and was removed from her positions as an officer and director of the McMillen Compa-

nies in January 1993. In any event, however, Pellegrino suffered what she considered to be acts of harassment by the McMillen family members—and particularly Joyce Olson—with whom she worked in the Companies' offices. These acts included the "silent treatment," numerous incidents of Joyce Olson allegedly screaming at Pellegrino, and an incident in which Pellegrino was allegedly hit in the chest with some books. Finally, on March 10, 1993, Pellegrino was terminated from her employment. James, Robert, and Joyce were the primary persons involved in the decision to terminate Pellegrino's employment, although Pellegrino alleges that John Jarzab, the financial director, was also involved in the decision to terminate her employment.

Pellegrino is, and for many years has been, a shareholder of all three McMillen Companies. The parties are currently engaged in a separate dispute concerning Pellegrino's request that the Defendants repurchase her shares and her allegations of mismanagement of the businesses. Defendants maintain that this separate dispute commenced prior to Pellegrino's termination from employment and led to her retention of counsel and threats that she would sue the Companies as well as their officers and shareholders. Pellegrino admits that there was a meeting between her counsel and representatives of the Defendant Companies on August 7, 1992, but denies that she ever threatened to sue the Companies prior to her discharge. Nevertheless, a lawsuit concerning these matters is currently pending in the Warren County, Pennsylvania Court of Common Pleas.

Following her termination from the Companies, Pellegrino filed a timely charge with the EEOC and received a notice of her right to sue. Plaintiff alleges that she also filed a timely charge with the Pennsylvania Human Relations Commission. She subsequently filed the instant action alleging four causes of action for violations of Title VII, ADEA, ERISA, and the PHRA, respectively. Defendants have moved for summary judgment on all counts.

## II. STANDARD OF REVIEW

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). On a motion for summary judgment, all facts must be construed in the light most favorable to the non-movant. *International Raw Materials, Ltd. v. Stauffer Chemical Co.*, 898 F.2d 946, 949 (3d Cir.1990).

Once the moving party has satisfied its burden of identifying evidence which demonstrates the absence of a genuine issue of material fact, the non-moving party must demonstrate by affidavits and other materials the existence of specific material facts which give rise to a genuine issue. FED. R. CIV. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Equimark Commercial Finance Co. v. C.I.T. Financial Services Corp.*, 812 F.2d 141, 144 (3d Cir.1987); *Shultz v. Barko Hydraulics, Inc.*, 832 F.Supp. 142 (W.D.Pa. 1993). In so doing, the non-movant may not rest upon bear assertions, conclusory allegations or mere suspicion, but must set forth specific facts showing that there is a genuine issue for trial. *Ness v. Marshall*, 660 F.2d 517, 519 (3d Cir.1981); *Barcelona v. Fox Grocery Co. Employees Pension Plan*, 483 F.Supp. 1128, 1134 (W.D.Pa.1980). An issue of material fact is considered "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

*Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. DISCUSSION

### A. Defendants' Motion for Summary Judgment

#### 1. Plaintiff's Title VII, ADEA, and PHRA Claims

Plaintiff claims that she was unlawfully terminated because of her age and sex in violation of Title VII of the Civil Rights Act, ADEA, and the PHRA.

 Disparate treatment cases are typically considered under one of two analyses: (1) the "mixed motive" analysis set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), and its progeny; or (2) the "pretext" analysis articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and further refined in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).[2] In a pretext case, the plaintiff argues that the employer's facially legitimate reasons for an adverse employment action are false and that the true reason for its decision was an unlawful discriminatory animus. *Griffiths v. CIGNA Corp.*, 988 F.2d 457, 468 (3d Cir.1993), *cert. denied*, 510 U.S. 865, 114 S.Ct. 186, 126 L.Ed.2d 145 (1993), *overruled in non-relevant part*, *Miller v. CIGNA Corp.*, 47 F.3d 586, 596 n. 8 (3d Cir.1995)(en banc). In a mixed motives case, the plaintiff seeks to

---

**2.** Because the same evidentiary burdens are often applied to Title VII and ADEA claims, *see Fuentes v. Perskie*, 32 F.3d 759, 764 n. 6 (3d Cir.1994); *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 n. 10 (3d Cir.1994), *Duffy v. Wheeling Pittsburgh Steel Corp.*, 738 F.2d 1393, 1396 (3d Cir.1984), *cert. denied*, 469 U.S. 1087, 105 S.Ct. 592, 83 L.Ed.2d 702 (1984), we address Plaintiff's Title VII and ADEA claims together and cite applicable case law interchangeably for both causes of action.

In addition, courts in this circuit have considered PHRA pretext claims using an analytical framework identical to that used in Title VII and ADEA claims. *See Griffiths v. CIGNA Corp.*, 988 F.2d 457, 469 n. 10 (3d Cir.1993), *cert. denied*, 510 U.S. 865, 114 S.Ct. 186, 126 L.Ed.2d 145

(1993) (citing *Allegheny Housing Rehabilitation Corp. v. Com. Pa. Human Relations Comm'n*, 516 Pa. 124, 532 A.2d 315, 318–19 (1987)), *overruled in part on non-relevant grounds, Miller v. CIGNA Corp.*, 47 F.3d 586, 596 n. 8 (3d Cir.1995)(en banc); *Talluto v. RCA*, 743 F.Supp. 346, 348 (M.D.Pa.1989), *aff'd*, 909 F.2d 1477 (3d Cir. 1990). *See also Fairfield Twp. Volunteer Fire Co. No. 1 v. Com. Pa. Human Relations Comm'n*, 530 Pa. 441, 609 A.2d 804, 805 (1992) (observing that the Pennsylvania Supreme Court has reaffirmed for use in PHRA employment discrimination cases the analytical model set forth in *Burdine*). We will therefore consider Pellegrino's PHRA claim in the same fashion as her federal discrimination claims.

prove that the adverse employment decision resulted from a mixture of legitimate and prohibited discriminatory motives. *Id.* 988 F.2d at 469. As an initial matter, the Court must determine whether one or both of the foregoing paradigms is applicable in this case.[3]

■■■ Whether a pretext or a mixed-motives case has been presented depends on the type of circumstantial evidence the employee produces in support of her claim. *Hook v. Ernst & Young,* 28 F.3d 366, 373 (3d Cir. 1994). A plaintiff has an easier burden in making out a prima facie pretext case because she may rely on either direct evidence of discrimination or on circumstantial evidence. *Griffiths,* 988 F.2d at 470. While circumstantial evidence may be relied upon in a mixed-motives case, "[a]t a bare minimum, a plaintiff seeking to advance a mixed motive case will have to adduce circumstantial evidence 'of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude.'" *Id.* (following *Ostrowski v. Atlantic Mut. Ins. Cos.,* 968 F.2d 171, 182 (2d Cir.1992)). Thus, the circumstantial evidence presented in a mixed motives case "must be tied directly to the alleged discriminatory animus." *Ostrowski,* 968 F.2d at 182. *See also Armbruster,* 32 F.3d at 778 (evidence in a mixed-motives case must directly reflect a discriminatory or retaliatory animus on the part of a person involved in the decision-making process).

In contrast to a mixed-motives case, "[t]he type of evidence required in a pretext case is not overt or '[e]xplicit evidence of discrimination—i.e. the 'smoking gun.'" *Armbruster,* 32 F.3d at 782. Rather, a plaintiff may rely on circumstantial or other competent evidence that the presumptively valid reason for the adverse employment action was actually a cover–up for discriminatory action. *Id.*

Whether a case is properly classified as a pretext or mixed-motives case has significant bearing on the parties' respective burdens of proof. If a plaintiff in a mixed-motives case makes a prima facie showing that the alleged discriminatory animus was a "motivating" or "significant" factor in the employment decision, the defendant may avoid liability by successfully asserting that it would have made the same decision even if the forbidden consideration had played no role. *Griffiths,* 988 F.2d at 469. The defendant, however, bears the ultimate burden of persuasion on this issue at trial. *Armbruster,* 32 F.3d at 778. In a pretext case, the plaintiff has the burden of establishing her prima facie case by demonstrating that she: (1) is a member of a protected group; (2) was qualified to perform the job at issue; (3) was dismissed or otherwise suffered adverse employment action despite being qualified for the position; and (4) was replaced by another employee sufficiently younger, or otherwise outside the protected group, so as to permit an inference of discrimination. *Armbruster,* 32 F.3d at 777; *Maxfield v. Sinclair Int'l,* 766 F.2d 788, 791–92 (3d Cir.1985), *cert. denied,* 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986). Once a plaintiff establishes a prima facie case of discrimination, the defendant has the burden of producing some legitimate, non-discriminatory explanation for its action. *Burdine,* 450 U.S. at 252–55, 101 S.Ct. 1089; *Griffiths,* 988 F.2d at 469. If the defendant satisfies this burden of production, the plaintiff must offer evidence tending to show that the defendant's explanation is merely a pretext for discrimination by showing that the proffered explanation is unworthy of credence. *Burdine,* 450 U.S. at 254–56, 101 S.Ct. 1089; *Armbruster,* 32 F.3d at 778; *Griffiths,* 988 F.2d at 469.

The plaintiff's ultimate burden at trial in a pretext case will be to demonstrate by a fair preponderance of the evidence (1) that the employer's proffered explanation is pretextual, *and* (2) that the discriminatory motive was the true reason for the adverse action. *St. Mary's Honor Ctr.,* 509 U.S. at 511 n. 4, 515, 113 S.Ct. 2742. If the fact finder does not believe the defendant's explanation, such disbelief, together with the elements of the prima facie case, may permit an inference

---

**3.** A plaintiff need not elect between proceeding on a pretext theory or advancing a mixed motives theory. "Rather, ... an employee may present his case under both theories and the district court must then decide whether one or both theories properly apply at some point in the proceedings prior to instructing the jury." *Armbruster,* 32 F.3d at 781 n. 17.

that a discriminatory animus was a motivating factor in the adverse employment decision. *Id. See also Armbruster*, 32 F.3d at 783; *Seman v. Coplay Cement Co.*, 26 F.3d 428, 433 (3d Cir.1994).

### a) *Plaintiff's Sex Discrimination Claim*

Defendants contend that Plaintiff cannot establish a prima facie case of sex discrimination under a mixed-motives analysis because she can neither point to overt or direct evidence of discrimination, nor adduce circumstantial evidence tied directly to a discriminatory animus. They argue that Plaintiff cannot establish a prima facie case of sex discrimination under a pretext analysis because Plaintiff was not replaced by persons outside her protected class.

In her brief opposing summary judgment, Plaintiff does not attempt to demonstrate either a pretext or mixed-motives sex discrimination case. Rather, she premises her Title VII claim on alleged *quid pro quo* sexual discrimination. Plaintiff alleges that her sexual relationship with Wendell McMillen, at least at its inception, was coercive and a condition of her continued employment. Although she concedes that she cannot now recover damages for these prior coercive acts, Pellegrino claims that they are relevant to this action. She alleges that the McMillen children adopted their father's longstanding policy of *quid pro quo* sexual harassment by discharging her because of the sexual relationship she had with him:

> [Plaintiff's] working conditions required her both to perform office work and personal services linked to her sex as a woman. Once the latter services were no longer possible, she could not be judged purely on traditional job performance, in which she excelled, and was discharged.

(Pl.'s Br. in Opp. in Summ. Judgmt. at 19.)

The primary support for Plaintiff's allegations of quid pro quo harassment comes from her affidavit submitted in opposition to summary judgment. Because of its potential relevance to our disposition of Defendants' motion for summary judgment, we will brief-

ly address Defendants' motion to strike certain portions of the affidavit.

### (i) *Defendants' Motion to Strike Portions of Plaintiff's Affidavit*

■ Defendants object to Paragraphs 11–16 and 18–34 of Pellegrino's affidavit.[4] These paragraphs concern Plaintiff's relationship with Wendell McMillen and outline various acts of oppressive harassment and coercion on his part. Among other things, these paragraphs allege that Wendell:

— persisted in making sexual advances toward Plaintiff on numerous occasions despite her resistance (¶¶ 11–15, 18);

— raped Plaintiff in his car on one occasion (¶ 19);

— grabbed and kissed Plaintiff in the office and wrestled her down to the couch in an attempt to have intercourse with her (¶ 22);

— discouraged Plaintiff from accepting other employment and interfered with her relationships with other men (¶¶ 20–21; 26–30);

— followed Plaintiff and called her at home in order to keep track of her activities (¶¶ 31–33).

Defendants move to strike these averments on the ground that they contradict Plaintiff's previous sworn testimony, her verified answers to interrogatories, her complaint and her pretrial statement in the instant case, as well as her verified complaint and answers to interrogatories submitted in a related state court proceeding. Defendants state that, despite fairly extensive discovery and numerous filings in this case, Plaintiff has never previously asserted or alluded to a *quid pro quo* sexual discrimination claim.

■ Upon review of the entire record in this case, we agree with Defendants that Paragraphs 11–16 and 18–34 of Plaintiff's affidavit are improper and should be disregarded for purposes of our resolution of the

---

**4.** Defendants also move to strike Paragraph 73 of Plaintiff's affidavit, which states that Plaintiff "never threatened to sue any of the McMillen companies and ... never instructed [her] attor-

ney to do so." (Pl's. Aff., ¶ 73.) We will address Defendants' motion to strike Paragraph 73 in the context of Plaintiff's age discrimination claim, *infra*.

Defendants' summary judgment motion. It is well established in this Circuit and others that a plaintiff can not create a genuine issue of fact sufficient to withstand summary judgment merely by submitting an affidavit which contradicts her prior sworn testimony. *See Hackman v. Valley Fair,* 932 F.2d 239, 241 (3d Cir.1991); *Martin v. Merrell Dow Pharmaceuticals, Inc.,* 851 F.2d 703, 706 (3d Cir. 1988); *Clark v. Hess Trucking Co.,* 879 F.Supp. 524, 531–32 (W.D.Pa.1995); *Maietta v. United Parcel Serv., Inc.,* 749 F.Supp. 1344, 1359 (D.N.J.1990), *aff'd,* 932 F.2d 960 (3d Cir.1991). *See also Russell v. Acme-Evans Co.,* 51 F.3d 64, 67–68 (7th Cir.1995); *Camfield Tires, Inc. v. Michelin Tire Corp.,* 719 F.2d 1361, 1364–65 (8th Cir.1983); *Perma Research & Dev. Co. v. Singer Co.,* 410 F.2d 572, 577–78 (2d Cir.1969). The rationale for this policy is that:

> [i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.

*Martin,* 851 F.2d at 706 (quoting *Perma Research,* 410 F.2d at 578).

In this case the state of the record prior to the filing of Plaintiff's affidavit contains no reference to an oppressive or nonconsensual sexual relationship between Wendell McMillen and Pellegrino. In her complaint, Pellegrino specifically avers that emphasis *"[b]eginning on or about January of 1990,* when Wendell W. McMillen began to lose control over his businesses and his children began to control the operations, a pattern of harassment of Plaintiff based upon her age and sex *began."* (Complaint ¶ 15 (emphasis supplied).) Paragraphs 16–23 of the Complaint outline the various acts of sexual harassment upon which Plaintiff's lawsuit is based. Nowhere in her Complaint does Plaintiff allege that the Defendants' discriminatory conduct is a mere continuation of a policy of quid pro quo sexual discrimination begun by Wendell McMillen. By contrast, in her affidavit Plaintiff avers that Wendell initiated a pattern of sexual harassment shortly after she

commenced employment with the lumber company. (Aff. ¶ 11.)

Moreover, during her deposition defense counsel questioned Plaintiff about the details of her sex discrimination claim and the facts upon which it is based. Nowhere in her lengthy and comprehensive deposition did Plaintiff indicate that her relationship with Wendell McMillen was ever anything other than consensual, respectful and loving. The Court specifically notes Plaintiff's testimony that her romantic relationship with Wendell McMillen began sometime between 1950 and 1960 and that it did not develop into a sexual relationship until sometime in the early 1970s. (Pl.'s Depo. at 40–43.) By contrast, Plaintiff states in her affidavit that Wendell McMillen began making sexual advances "[s]hortly after [she] started [her] job," (*see* ¶ 11), and that at one point during those years he raped her in his car. (¶¶ 18–19.) At deposition, Plaintiff characterized Wendell McMillen's behavior most favorably, observing that Wendell "was always very respectful of [her], that he "regarded [her] in the highest esteem," and that he treated her "fairly" and "appropriately." " (Pl.'s Depo. at 48, 110, 340.) By contrast, Pellegrino's affidavit alleges that Wendell interfered in her personal life, acted jealously and possessively toward her, and repeatedly engaged in uninvited—and sometimes abusive—sexual advances toward her. In short, the portrait painted of Wendell McMillen's conduct in Plaintiff's affidavit is anything but loving, appropriate, respectful or fair. This rather significant aspect of Plaintiff's work history was never mentioned at all during Plaintiff's deposition, despite repeated questioning by the defense designed to elicit all the factual support for Plaintiff's sex discrimination claim. (*See* Pl.'s Depo. at 96–107, 174, 213.)

Plaintiff's pretrial statement also purports to outline her theory of liability on the sex discrimination claim and the factual basis underlying it. Consistent with her complaint, answers to interrogatories, and deposition testimony, Plaintiff's pretrial statement asserts that "[s]ometime in the 1950's, a romantic relationship developed between Wendell McMillen and the Plaintiff" (Pl.'s Pretrial Stmt. at p. 2.), but it makes no mention

of the oppressive quid pro quo discrimination allegedly inflicted by Wendell McMillen. The pretrial statement reiterates that the acts upon which Plaintiff bases her sex discrimination claim began *after* the McMillen children assumed control of the Companies. (*Id.* at p. 3–4.) There is no mention of the earlier discriminatory treatment by Wendell which is outlined so vividly in Plaintiff's affidavit. We therefore agree that Paragraphs 11–16 and 18–34 of Plaintiff's affidavit should be stricken because they present factual averments which are inconsistent in significant respects with Pellegrino's prior pleadings and sworn testimony.

Plaintiff protests that her affidavit does not present an inconsistent position but, rather, supplements her deposition testimony in areas where defense counsel simply failed to make proper inquiry. Having reviewed the entire record vis a vis Plaintiff's affidavit, the Court does not agree. Plaintiff stated in her deposition that her sexual relationship with Wendell McMillen did not commence until the early 1970s. Her affidavit suggests that sexual attacks from Mr. McMillen commenced shortly after her employment began in 1945, when she was still a young woman. The affidavit clearly implies that Plaintiff was raped by Mr. McMillen sometime during the early years of her employment and that Plaintiff had to constantly defend herself against unwanted sexual advancements. Plaintiff's reference to Wendell McMillen in her deposition as a respectful, loving and fair person is in stark contrast to the portrayal of a possessive, manipulative and morally depraved individual set forth in her affidavit. Plaintiff's averment that the discriminatory acts of which she complains began *after* Wendell's retirement is in stark contrast to the harassing conduct on his part which she outlines in her affidavit. In short, the flavor and theory of Plaintiff's case has changed dramatically following the filing of her affidavit.

Unlike Plaintiff, we do not believe that defense counsel can reasonably be held accountable for having failed to uncover this evidence during discovery. Defendants' interrogatories to Plaintiff sought details about the theory of Plaintiff's sex discrimination claim. Plaintiff responded by stating that this subject was more appropriately addressed by taking Plaintiff's deposition. Many times during the course of Plaintiff's deposition defense counsel sought, at least in spirit if not in precise terminology, to exhaust all of the factual bases underlying Plaintiff's sex discrimination claim:

Q: [L]et me cut the preface and let me ask you, of the things which lead you to believe that you were discriminated against based upon your sex discrimination case, ... all the things that led you to conclude that you were discriminated because you were female.

\* \* \* \* \* \*

Q: The question [Interrogatory 3] asks you to describe all of the acts which constitute the pattern of harassment which you allege existed. You have listed, beginning at the top of page 2 of your Answers, a number of things. I'd like to ask you to take a moment to look at that and my first question after you get a look at this, is this everything you recall, because you qualify your answer by saying this is a description of some of the acts committed by the defendants which constitute a pattern of harassment, and I want to ask you whether sitting here today are there any others that you can recall?

\* \* \* \* \* \*

Q: [C]an you tell me all of the ways in which you alleged you were discriminated against because of your sex?

\* \* \* \* \* \*

Q: I don't mean to belabor this. I want to make sure to the extent you can remember specific instances of treatment which you claim was motivated by discriminatory treatment, motivated by your sex. I want to make sure we get them out here on the table. Are there any other specific instances other than those referenced in this Answer to Interrogatory No. 3 and the ones you have mentioned that you can recall?

\* \* \* \* \* \*

Q: I wanted to make sure I got out on the table all the things you claimed were sex discrimination. Are there any more of those that you can recall?

(Pl.'s Depo. at 96–107.)

Q: My question, just so we are clear, is: are you referring to anything other than what we have already discussed today and what's included in the written Answers that you have submitted when you refer to unlawful acts, practices, policies and procedures which constituted sex discrimination? Is there anything else you believe constituted sex discrimination that we have not discussed? I'd like you to add it now.

(Pl.'s Depo. at 174.)

The very clear implication of these questions is that Defendants were seeking to discover all of the factual support which Plaintiff might offer to establish her sex discrimination claim. We do not believe that Plaintiff can seriously contend that defense counsel simply failed to phrase the proper question. Nowhere in her complaint does Plaintiff articulate her present theory that the McMillen children's actions were a mere continuation of a quid pro quo sexual discrimination policy first instituted by their father. At Plaintiff's deposition, defense counsel specifically questioned Plaintiff about the history of her relationship with Wendell McMillen. She responded that their romantic relationship began sometime between 1950 and 1960 and that it did not become sexual until the 1970's. Plaintiff neither sought nor provided clarification regarding her alleged sexually coercive relationship with Wendell McMillen. We also note that in her verified Complaint in a related state court proceeding, Plaintiff avers that "[a]s long as Wendell McMillen was in control of the McMillen Companies, Pellegrino believed she was treated fairly as a shareholder, director, officer and employee of the McMillen companies." (Pl.'s Ex. A at ¶ 24.) Under the circumstances, we cannot fault defense counsel's efforts or question their diligence in attempting to elicit all the relevant facts from Plaintiff concerning her claim. On the other hand, we find that Plaintiff has been purposefully evasive regarding the critical facts she now relies on to establish quid pro quo sex discrimination.

For all of the foregoing reasons, we conclude that it is appropriate to grant Defendants' motion to strike Paragraphs 11–16 and 18–34 of Pellegrino's affidavit.

### (ii) The Merits of Plaintiff's Sex Discrimination Claim

Having determined that Paragraphs 11–16 and 18–34 of Plaintiff's affidavit should be stricken, the Court concludes that Defendants are entitled to summary judgment on Plaintiff's sex discrimination claim because the record is insufficient to support a case of quid pro quo sex discrimination. Absent the objectionable portions of Plaintiff's affidavit, there is no dispute but that the relationship between Pellegrino and Wendell McMillen was consensual. However, disparate adverse treatment toward an employee based on the employee's consensual sexual relationship with a fellow worker does not alone support an action for sex discrimination if the reason for the disparate treatment is nepotism or some other factor aside from gender. *See, e.g., Platner v. Cash & Thomas Contractors,* 908 F.2d 902, 904–05 (11th Cir. 1990)(no sex discrimination claim existed based on dismissal of employee who was perceived as having an office romance, even though her paramour was retained; the reason for employee's dismissal was nepotism rather than gender); *Freeman v. Continental Technical Serv., Inc.,* 710 F.Supp. 328, 331 (N.D.Ga.1988) (no Title VII claim where employee was discharged due to problems in her consensual romantic relationship with fellow employee; plaintiff was not terminated because she was a woman, but because of personal problems she was having with paramour and the personal animosity arising therefrom).

We note, however, that even if Plaintiff's affidavit were considered in its entirety, her sex discrimination claim still could not withstand summary judgment. Plaintiff seeks to use the evidence of alleged harassment by Wendell McMillen in order to shed light on the Defendant's motive in subjecting her to continued harassment after their fa-

ther's retirement and in dismissing her. She claims that Defendants' actions were merely a continuation or adoption of Wendell McMillen's longstanding coercive policy of quid pro quo sexual harassment.

The problem with this argument is that there is no evidence in the record indicating an identity of interests between Wendell McMillen and his children insofar as Plaintiff's treatment is concerned. Assuming that Wendell McMillen did engage in coercive quid pro quo sexual discrimination, there is no evidence whatsoever to suggest that the McMillen children ever *knew* of such conduct, much less that they condoned or sought to perpetuate it. By all accounts, the McMillen children viewed Plaintiff's relationship with their father as consensual and resented her precisely because of this special relationship. In short, the record is clear that the children sought to discourage this relationship, not encourage it. We therefore cannot see how the alleged discriminatory conduct of Wendell McMillen, even were it properly part of this Court's consideration, bears any relevance as to his children's motivation in later terminating Plaintiff's employment.

Finally, Plaintiff complains that, while she was falsely stereotyped as a sex object and maligned by the McMillen children, Wendell McMillen was never held to the same standard. Although this may be true, we consider such disparate treatment to be in the nature of nepotism. Unfortunately for Plaintiff, nepotism does not provide a cause of action under Title VII. We will therefore enter summary judgment for Defendants on Plaintiff's sex discrimination claim.

b) *Plaintiff's Age Discrimination Claim*

i) *mixed-motives analysis*

Plaintiff seeks to assert her age discrimination claims under both mixed-motives and pretext theories. Defendants contend that Plaintiff cannot establish a prima facie case of age discrimination under a mixed-motives analysis because she can neither point to overt or direct evidence of discrimination nor adduce circumstantial evidence tied directly to a discriminatory animus. Plaintiff responds by pointing to two comments which, she states, directly reflect a discriminatory animus.

 The first comment is contained in the affidavit of John Young, which Defendants have moved to strike. The Young affidavit, in its entirety, states as follows:

1. My name is John Young and I reside in Waldbank, Pennsylvania.

2. I own a bowling alley and Joyce Olson bowls at my bowling alley.

3. On one occasion while Wendell McMillen was sick at home with his final illness, Joyce Olson was at the bowling alley and told my wife Martha that Angie Pellegrino was old fashioned and didn't want anything to do with the computers in the office at the McMillen's lumber business.

I verify that the statements made in this affidavit are true and correct to the best of my knowledge, information and belief, and I declare under penalty of perjury that the foregoing is true and correct.

Date: 12/8/1995

/s/ John P. Young
John Young

(Pl.'s Ex. H.)

Defendants move to strike Paragraph 3 of this affidavit on the grounds that it does not comport with Rule 56(e) of the Federal Rules of Civil Procedure. Rule 56(e) states that: "[s]upporting or opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Compliance with these requirements is essential if the Court is to consider the evidence contained in an affidavit. *See Rolick v. Collins Pine Co.,* 708 F.Supp. 111, 115–16 (W.D.Pa.1989) (citing Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 2738), *rev'd on other grounds,* 925 F.2d 661 (3d Cir.1991).

Upon careful consideration, the Court finds Defendants' motion to be well taken. Specifically, we find Young's affidavit deficient under Rule 56(e) because it is not made upon personal knowledge and because it contains inadmissible hearsay evidence. Plaintiff protests that the alleged statement of

Joyce Olson is not hearsay for two reasons. For one, Plaintiff argues, it is not being offered to prove the truth of the matter asserted—i.e. that Plaintiff actually was "old fashioned" and did not want to use computers; to the contrary, Plaintiff is attempting to prove that she was quite able and willing to use computers. Second, Plaintiff argues, the statement by Olson constitutes an admission by a party opponent under Fed.R.Evid. 801(d)(2)(D).[5]

Assuming that Plaintiff is correct in these regards, we nevertheless conclude that Young's affidavit is improper. Significantly, the affidavit states that Joyce Olson made her alleged comment *to Young's wife,* not to Young. It thus appears that Young learned of this statement from his wife, rather than witnessing it himself first hand, and Plaintiff does not contend otherwise in her brief opposing the motion to strike. Herein lies the problem. Even if Olson's statement to Mrs. Young does not itself constitute hearsay, the relation of that statement to Young by his wife *is* hearsay because the implied statement of Young's wife—namely, that Joyce Olson said Plaintiff was old fashioned and reluctant to use computers—is being offered to prove the truth of the matter asserted— i.e. that Joyce Olson actually made the comment attributed to her. Because the information conveyed to Young by his wife is inadmissible hearsay, Paragraph 3 of Young's affidavit is improper and should be stricken. Moreover, Young's affidavit does not purport to set forth statements made upon his own personal knowledge and is therefore critically deficient in this regard as well. For these reasons, the Court will disregard Paragraph 3 of the Young affidavit in resolving the Defendants' summary judgment motion.

▇▇▇ The second comment which Plaintiff relies upon in attempting to make out a prima facie mixed-motives age discrimination case is a comment allegedly made by the Companies' accountant, John Jarzab, to Pel-

legrino on her 65th birthday. As Jarzab and Pellegrino entered a January 26, 1993 shareholders meeting, Jarzab allegedly stated in a sarcastic tone: "I see you had a 65th birthday. I didn't know you were 65 until I started looking at some of your records. Happy 65th." (Pellegrino Depo. at 106, 169–70.)[6] Pellegrino was subsequently removed as a director and officer of the Companies during that same meeting.

▇▇▇ Defendants maintain that Jarzab was not involved in the determination to discharge Plaintiff and that only the McMillen children participated in that decision. Thus, Defendants characterize Jarzab's statement as a stray remark by a non-decisionmaker. They point out that such remarks are insufficient to sustain a prima facie case under a mixed-motives analysis. *See Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. 1775; *Armbruster,* 32 F.3d at 778. Defendants also state that the McMillen children did not discuss Jarzab's comment with him ahead of time and were not aware that the comment had ever been made.

Plaintiff does not dispute that the primary decision makers regarding her termination were James and Robert McMillen and Joyce Olson. However, she contends that "the record establishes that the financial director John Jarzab was [also] involved in the decision to terminate the Plaintiff." (Pl.'s Response to Def.s' Stmt. of Undisputed Facts at ¶ 15, p. 10.) She points out that Jarzab attended the directors' meeting wherein the decision was made to terminate Plaintiff's position as an officer and director of the Companies. Additionally, Plaintiff points to evidence that Jarzab had significant influence with Wendell McMillen as well as with the McMillen children. Plaintiff notes that Jarzab referred to Wendell McMillen as his "best friend" and was always present at the company meetings. Finally, Plaintiff observes that, after the onset of Wendell

---

5. Rule 801(d)(2)(D) provides, in relevant part:
 **(d) Statements which are not hearsay.** A statement is not hearsay if—
 **(2) Admission by party-opponent.** The statement is offered against a party and is ... (D) a statement by the agent or servant concerning a matter within the scope of the agen-

cy or employment, made during the existence of the relationship.

6. Although Jarzab disputes this version of the events, for purposes of resolving a summary judgment motion we credit Plaintiff's version of the facts.

McMillen's illness, when Wendell sought to make changes in his will and contacted his attorney for the purpose of doing so, it was Jarzab whom the attorney decided to consult regarding his concerns about the proposed will changes rather than any of the McMillen children.

We find this evidence insufficient to create a genuine dispute on the issue of whether Jarzab participated in the decision to discharge Pellegrino. A dispute regarding a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Here, the evidence construed most favorably to Plaintiff demonstrates only that Jarzab was a close family friend of the McMillens and that he routinely sat in on company meetings. The evidence falls short of permitting an inference that Jarzab participated in the decision to terminate Plaintiff's employment.

As Plaintiff can produce no other evidence directly tied to or reflective of a discriminatory animus, she fails to establish a prima facie case of age discrimination under a mixed-motives analysis. Summary judgment is therefore warranted on Plaintiff's age discrimination claim, unless she can establish a viable claim under a pretext analysis.

### ii) pretext analysis

Under a pretext analysis the Plaintiff establishes a prima facie case of age discrimination by demonstrating that she: (1) is within the protected age class; (2) was qualified to perform the job at issue; (3) was dismissed despite being qualified for the position; and (4) was replaced by another employee sufficiently younger to permit an inference of age discrimination. *Armbruster v. Unisys Corp.*, 32 F.3d at 777. Defendants assume for purposes of their summary judgment motion that Plaintiff can establish a prima facie case.

Nevertheless, Defendants assert that they are entitled to summary judgment because Plaintiff cannot adequately rebut the legitimate, non-discriminatory reasons they proffer for her discharge. Defendants represent that the McMillen children decided to terminate Pellegrino's employment because they disliked and resented her as a result of her affair with their father, because of the effect that affair had on their family life, and because of the manner in which Pellegrino allegedly attempted to use her relationship with their father to exert control over them. Defendants claim that this animosity and power struggle resulted in intolerable friction in the work place. In addition, Defendants assert that Pellegrino's value to the Companies was diminished by her refusal to use the Companies' computer system and by the fact that, following Wendell's retirement, she had little work to do. The "final straw," according to Defendants, was Pellegrino's alleged threat to sue the Companies and the McMillen children in order to force them to repurchase her company shares at the price she demanded. All of these factors allegedly combined to produce a work environment in which the McMillen children, especially Joyce Olson, could not co-exist with Plaintiff in a cordial and productive fashion.

In order to survive summary judgment when the defendant offers a legitimate reason for its employment action, a plaintiff must be able to adduce evidence which:

(1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or (2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.

*Fuentes v. Perskie*, 32 F.3d at 762. *See also, Burdine*, 450 U.S. at 256, 101 S.Ct. 1089; *Armbruster*, 32 F.3d at 783. Though the evidence may be circumstantial or direct in nature, it must be sufficient to support a reasonable inference that each of the employer's proffered reasons was either a *post hoc* fabrication, or otherwise did not actually motivate the employment action. *Fuentes*, 32 F.3d at 764. Moreover, in order to discredit the employer's proffered reasons, the plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence,' ... and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.' " *Id.* (internal citations omitted, emphasis in the original).

Upon review of the record, we conclude that Plaintiff has adduced sufficient evidence to cast doubt on the veracity of several of the Defendants' proffered reasons for her termination. Specifically, we note Plaintiff's averment in her sworn affidavit that, at the time of her termination, she was regularly using the computers at work, she was involved in computer training at her own expense, and she was not only willing but desirous of using the computers. This evidence directly contradicts Defendants' allegation that Plaintiff's value to the Companies was diminished by her unwillingness to use computers.

Plaintiff also offers evidence that her job responsibilities were not historically limited solely to acting as Wendell McMillen's secretary, but encompassed a variety of tasks such as: receipt and distribution of the mail; bookkeeping; making large item purchases; handling compensation claims; typing correspondence; handling customer inquiries; maintaining pension account records; communicating with brokers regarding stock investments; preparing salary payroll and tax statements; and various other duties. She contends that these jobs were never eliminated but, instead, were gradually taken away from her against her wishes. She points out that, despite Wendell McMillen's retirement, many of these same job responsibilities remained and needed to be performed. These facts tend to undercut the Defendants' con-

tention that, following Wendell McMillen's retirement, Pellegrino had little work to do.

In addition, the record indicates that Pellegrino was a minority shareholder and was summarily voted out as an officer and director of the Companies in January of 1993. She disputes that the alleged animosity was two-sided and maintains that she was always courteous and polite toward the McMillen children. She points out that, despite the children's awareness of her affair even during their high school years, they managed to cope and work effectively with Plaintiff for many years up until the time of Wendell McMillen's retirement. This evidence potentially undermines the Defendants' assertion that there was a power struggle between the McMillen children and Pellegrino concerning the operation of the Companies and that an intolerable level of stress existed in the work place.

■ Finally, Pellegrino denies at Paragraph 73 of her affidavit that she ever threatened to sue, or instructed her attorney to threaten to sue, the McMillen Companies and/or their employees over the stock repurchase issue. This evidence directly contradicts Defendants' assertion that Pellegrino did threaten to sue the Companies and their officers.[7]

Based upon the foregoing, we conclude that a jury would be entitled to infer that each of the foregoing proffered explanations either was a post hoc fabrication or otherwise did not motivate Plaintiff's discharge. Defendants maintain that Plaintiff has not adequately rebutted the fact that the McMillen children resented her because of her affair with their father.[8] Significantly, however,

---

**7.** Defendants move to strike the allegation in Paragraph 73 on the ground that, during her deposition, Plaintiff's attorney prevented defense counsel from inquiring about the instructions that Pellegrino gave her counsel regarding the stock repurchase dispute. Defendants argue that, having asserted the attorney-client privilege at deposition, Plaintiff cannot now utilize the privileged information to oppose summary judgment.

Unfortunately, Defendants cite no authority in support of this proposition, and the Court has found none that would bind it to rule as Defendants request. In any event, we note that the attorney-client privilege belongs to the client,

Pellegrino, and it is for her to decide if and when to waive the privilege. Having now done so, the matter is no longer privileged and the Court will specifically permit Defendants to conduct further discovery on this issue to the extent they feel it would be productive. However, the Court will not grant the motion to strike Paragraph 73 of Plaintiff's affidavit.

**8.** Defendants also submit that Plaintiff has not adequately rebutted the allegation that she threatened to sue the Companies and/or their directors and officers over the stock repurchase dispute. In so arguing, Defendants rely on their motion to strike Paragraph 73 of Plaintiff's affi-

Defendants do not contend that this animosity was the *sole* reason for Plaintiff's discharge. By their own admission, the animosity felt by the McMillen children was only one of several alleged factors which cumulatively led to the decision to terminate Pellegrino's employment. Under *Fuentes*, a plaintiff attempting to defeat summary judgment need not cast doubt on each of the defendant's proffered reasons in a vacuum. Rather:

> [i]f the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder. That is because the factfinder's rejection of some of the defendant's proffered reasons may impede the employer's credibility seriously enough so that a factfinder may rationally disbelieve the remaining proffered reasons, even if no evidence undermining those remaining rationales in particular is available.

32 F.3d at 764–65 n. 7. Because Pellegrino has presented evidence which casts sufficient doubt on most of Defendants' proffered reasons, her age discrimination pretext claim survives despite her present inability to separately rebut every proffered reason offered by the Defendants. The Court will deny summary judgment on Plaintiff's ADEA and PHRA age discrimination claims insofar as they are premised upon a pretext theory.

### 2. Plaintiff's ERISA Claim

▮ Count III of Pellegrino's complaint asserts a violation of Section 510 of ERISA. This claim is based on the allegation that Defendants intentionally discharged Plaintiff from her employment in March 1993 for the purpose of depriving her of the additional employer pension contributions to which she would have been entitled had she remained employed by the Defendant Companies until the end of their 1993 fiscal years. Section 510, codified at 29 U.S.C. § 1140, states, in relevant part:

> It shall be unlawful for any person to discharge ... or discriminate against a

participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan.

The Third Circuit Court of Appeals has interpreted § 510 to require proof of specific intent to violate ERISA. *Gavalik v. Continental Can Co.*, 812 F.2d 834, 851 (3d Cir. 1987), *cert. denied*, 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987). Defendants argue that they are entitled to summary judgment on this claim because there is no evidence that Plaintiff's discharge was undertaken for the purpose of depriving her of additional pension benefits.

▮ Courts in this circuit apply the *McDonnell Douglas* burden-shifting framework to cases brought under § 510. *See Kowalski v. L & F Products*, 82 F.3d 1283, 1288–89 (3d Cir.1996); *Hendricks v. Edgewater Steel Co.*, 898 F.2d 385 (3d Cir.1990); *Gavalik*, 812 F.2d at 852. Plaintiff has the initial burden of establishing a prima facie case, which is done by demonstrating: (1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled. *Berger v. Edgewater Steel Co.*, 911 F.2d 911, 922 (3d Cir.1990), *cert. denied*, 499 U.S. 920, 111 S.Ct. 1310, 113 L.Ed.2d 244 (1991); *Hendricks*, 898 F.2d at 389; *Gavalik*, 812 F.2d at 852. The requisite intent may be demonstrated through circumstantial evidence. *Hendricks*, 898 F.2d at 389.

▮ As Defendants point out, a termination or other adverse action which happens to result in a loss of benefits is insufficient by itself to establish a prima facie case under § 510. *Hendricks*, 898 F.2d at 390; *DeWitt v. Penn–Del Directory Corp.*, 912 F.Supp. 707, 720 (D.Del.1996); *Titsch v. Reliance Group, Inc.*, 548 F.Supp. 983, 985 (S.D.N.Y. 1982), *aff'd*, 742 F.2d 1441 (2d Cir.1983). Here, however, Plaintiff points to several other circumstantial factors which, she claims, permit an inference of specific intent

davit. As previously mentioned, the Court will deny that motion. Accordingly, Paragraph 73

stands as part of the record.

to violate ERISA. She observes that Joyce Olson, a decision-maker with respect to Plaintiff's discharge, was extremely familiar with ERISA requirements. Plaintiff further claims that Olson was aware of the Companies' policy and history pursuant to which any employee who was eligible for retirement benefits was permitted to structure the termination of her employment such that she would receive the employer's contribution to her pension plan for the year in which she retired. Plaintiff submits that she herself was the only employee in the history of the Companies who was forced to terminate her employment in such a fashion that she would not receive the employer's contribution to her pension for the year in which she retired.

■ This evidence is not sufficient to satisfy Plaintiff's prima facie pleading burden. For one, the mere fact that Joyce Olson was a decision-maker and that she was familiar with the requirements of ERISA and the functioning of the Companies' pension benefits plans does not give rise to a reasonable inference that Plaintiff was discharged for the specific purpose of interfering with her pension rights. Second, we do not accord significant weight to Plaintiff's assertion that she was the only employee in the history of the Companies who was not permitted to structure her termination in such a manner as to receive the employer contribution for that year. All of the other employees with whom Plaintiff compares herself were individuals who retired voluntarily, rather than being discharged. Thus, their manner of treatment is inapposite for purposes of demonstrating an intent to interfere with Plaintiff's pension rights. The only other evidence on which Plaintiff relies is the timing of her discharge and the fact that it resulted in an incidental loss of benefits. Other courts in this Circuit have found such evidence insufficient to demonstrate a specific intent to interfere with the attainment of pension rights. *See, e.g., Hendricks,* 898 F.2d at 389–90 (fact that pension plan was funded solely by employer, that employer was reducing costs, and that plaintiff was discharged eleven months short of vesting, resulting in complete forfeiture of benefits, did not establish requisite intent); *DeWitt,* 912 F.Supp. at 721 (evidence of plaintiff's termination two weeks

prior to Valuation Date for that year, together with alleged misrepresentation by plan administrator's agent, did not give rise to inference of invidious intent; plaintiff's assertion of invidious intent by reason of her termination two weeks prior to Valuation Date was conclusory and self-serving).

Because Plaintiff has failed to establish a prima facie case of a § 510 ERISA violation, summary judgment will be entered in favor of Defendants on this claim.

### 3. Defendants' Motion for Summary Judgment in Favor of Defendant McMillen Lumber Company of Sheffield, Inc. on All Counts

■ Defendants argue that, in any event, summary judgment should be granted in favor of Defendant McMillen Lumber Company of Sheffield, Inc. on all counts because Plaintiff was never employed by that company. Plaintiff was only on the payroll of the other two Defendant Companies—McMillen Lumber Products Corporation and Irwin Wood Products Corporation, Inc. McMillen Lumber Company of Sheffield paid no salary to Plaintiff, withheld no taxes, and provided no benefits. Defendants therefore contend that McMillen Lumber Company of Sheffield cannot be considered Plaintiff's employer for purposes of ADEA because there were no economic ties between Plaintiff and that company.

Plaintiff responds that all three McMillen Companies are clearly integrated enterprises for purposes of ADEA. She points out that, although her paychecks were written on the accounts for only two of the three Defendant Companies, she performed services for all three Companies. She submits that the three Companies together constitute the McMillen family business: McMillen Lumber Company is the saw mill operation, while McMillen Lumber Products and Irwin Wood Products are both dimension mill operations. There is evidence that employees are transferred freely from one operation to another, as needed, and that many employees perform services for all three Companies though they are not paid by all three. Moreover, the three Companies are managed out of one office. Mr. Jarzab, the accountant for the

corporations, refers to the business as one company—the "McMillen Lumber Company." Finally, the record suggests that intercompany transfers, involving transfers of either finished or raw lumber from one company to the other two, occur at the discretion of the directors.

■ Under *EEOC v. Zippo Mfg. Co.,* 713 F.2d 32, 36–38 (3d Cir.1983), the test for determining whether an individual is an "employee" for purposes of ADEA is a hybrid "right to control"/ "economic realities" standard requiring consideration of: (1) whether the alleged employer has the right to control the work to be performed by the employee and the method of performing it, and (2) whether the alleged employee is, as a matter of economic realities, dependent upon the business to which he or she renders services. Defendants maintain that Plaintiff cannot satisfy this hybrid test with respect to McMillen Lumber Company of Sheffield because she had no economic ties with that entity.

■ However, the Court is disinclined to assess Plaintiff's employment relationship with McMillen Lumber Company of Sheffield in a vacuum. Instead, we must consider whether McMillen Lumber Company might properly be viewed as part of a single integrated enterprise, together with the other two Defendant Companies. Under the "integrated enterprise" test applicable to ADEA cases, "the appropriate standard for determining whether nominally separate corporations are to be considered a single employer is whether they comprise an integrated enterprise." *Berkowitz v. Allied Stores of Penn–Ohio, Inc.,* 541 F.Supp. 1209, 1214 (E.D.Pa.1982)(quoting *Marshall v. Arlene Knitwear, Inc.,* 454 F.Supp. 715 (E.D.N.Y. 1978), *aff'd in part, rev'd in part, and remanded,* 608 F.2d 1369 (2d Cir.1979)(table case)). This requires consideration of: (1) the interrelation of operations; (2) common management; (3) centralized control of labor relations, and (4) common ownership or financial control existing between the two corporations. *Id.* Considering the present state of the record in the light most favorable to Plaintiff, we perceive a potential issue of fact as to whether McMillen Lumber Company of

Sheffield can properly be considered part of one integrated corporate entity, together with the other two Defendant Companies. There is no apparent dispute that Plaintiff satisfies the *Zippo* test for purposes of establishing that she was an employee of both McMillen Lumber Products and Irwin Lumber Products. If a jury were to conclude that the three Defendant Companies are but one corporate entity, the *Zippo* test would logically be satisfied with respect to McMillen Lumber Company of Sheffield as well. For these reasons, we will decline to enter summary judgment in favor of Defendant McMillen Lumber Company of Sheffield on Plaintiff's remaining counts.

B. *Defendants' Motion to Strike Plaintiff's Jury Trial Demand*

■ Defendants have also filed a motion to strike Plaintiff's jury trial demand with respect to her ERISA and PHRA claims. This motion is moot insofar as the ERISA claim is concerned, given our ruling that summary judgment will be entered in favor of the Defendants on that claim. Insofar as Plaintiff's PHRA claim is concerned, this Court is persuaded by the reasoning of several federal courts which, consistent with federal constitutional jurisprudence, have recognized a right to trial by jury on claims seeking legal remedies under the PHRA in federal court. *See Galeone v. American Packaging Corp.,* 764 F.Supp. 349, 352–54 (E.D.Pa.1991); *Lubin v. American Packaging Corp.,* 760 F.Supp. 450, 452–55 (E.D.Pa. 1991); *Welcker v. Smithkline Beckman* 746 F.Supp. 576, 581–83 (E.D.Pa.1990). Accordingly, Defendants' motion to strike Plaintiff's jury demand will be denied with respect to Plaintiff's remaining age discrimination claim under the PHRA.

## IV. *CONCLUSION*

For the reasons stated above, the Court will deny Defendants' motion for summary judgment with respect to Plaintiff's age discrimination pretext claims under the ADEA and PHRA. In all other respects, Defendants' motion for summary judgment will be granted. In addition, we will grant Defendants' motions to strike the challenged por-

tions of the Pellegrino and Young affidavits, except that we will deny Defendants' motion insofar as it seeks to strike Paragraph 73 of Plaintiff's affidavit. Finally, Defendants' motions to strike Plaintiff's jury demands will be denied.